STATE JOURNAL PRINTING COMPANY, Respondent, vs. CITY OF MADISON, Appellant.

*February 1—February 20, 1912.*

(1) *Trial: Setting aside perverse verdict.* (2–5) *Municipal corporations: Liability for negligence: Waterworks: Improper construction: Reliance on expert advice: Break in main: Injury to property: Delays in stopping flow: Questions for jury.* (6) *Appeal: Questions considered: Matters not litigated.*

1. Where the answer to one material question of a special verdict plainly shows that the jury made such answer perversely or by reason of passion or prejudice, the court may properly set the entire verdict aside, and should do so unless satisfied that the answers to the other questions were not affected by such perversity, passion, or prejudice.

2. In furnishing water to private consumers a municipal corporation is acting in a private business capacity and not in its governmental capacity, and for any failure to exercise ordinary care proximately causing injury to another is liable to the same extent as a private person or a corporation operating a waterworks system.

3. While it would be negligence to attempt to construct and operate a system of waterworks without expert advice as to the location of valves, the size and strength of pipes, and other details of construction, yet in a case where reputable engineers differ in their opinions it cannot be held a want of ordinary care to adopt in good faith a plan proposed by one school of experts in preference to another; and should an accident happen resulting in damage to a third person, proof of such good-faith action based on the advice of competent and reputable experts furnishes a complete defense against liability. *Piper v. Madison,* 140 Wis. 311, explained.

4. The fact that the location of a valve 260 feet distant from a water tower, instead of in the basement of the tower where the feed pipe turns upward, is not in accordance with the best engineering, does not establish negligent construction, without proof of some added danger on that account; and where, in a water system embracing an average of twenty-nine miles of mains, there have been but three breaks in the mains in twenty-four years, and the 260 feet of pipe leading to the water tower is located at the highest point of the system and is not tapped by service pipes, the likelihood of a break therein is, *it seems*, so remote as scarcely to be a substantial factor in the problem of location of such valve.

5. Where water was found to be entering the cellar of plaintiff's premises in the vicinity of a water tower on defendant's system, and defendant's employees, uncertain where the leak was located, spent three hours in uncovering and shutting off nine valves which controlled the water supply of that district, and in consequence plaintiff's premises were flooded and its property damaged, when by opening a valve in the waste pipe of the water tower and two hydrants near by, and reducing the water pressure temporarily, the tank in the tower, from which the water was coming, could have been emptied in a few minutes, it was a question for the jury whether defendant was chargeable with negligence.

6. The claim that the city was liable in such case on the ground that the water tower was a nuisance because located in a public street, will not be considered on appeal, where no such claim was made in the complaint or at the trial.

APPEAL from an order of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

This is an action for damages resulting from water which escaped from a broken main in the water system of the city of *Madison* and inundated the cellar of the plaintiff, inflicting damage by way of destruction of print paper, stereotype molds, etc. The accident happened on the morning of January 17, 1907, and is the same accident involved in the case of *Piper v. Madison,* 140 Wis. 311, 122 N. W. 730, the plaintiff here occupying the major part of the same building which the Piper Bros. occupied at the time of the accident.

The important facts appearing on the trial are that the city of *Madison* owned and operated its own system of direct

pressure waterworks, which were originally constructed in the year 1885. In the year 1890 a tower or standpipe was added to the system, principally for the purpose of equalizing the pressure, but also serving the purpose of a small reservoir. This water tower was located on East Washington avenue, one block northeast from Pinckney street. It is a brick structure, 161 feet in height over all, and contains a cylindrical metal tank twelve feet four inches in diameter and sixty feet in height, capable of holding about 54,000 gallons of water, the bottom of which is seventy-two feet above the ground. This tank is supplied with water by a ten-inch main, hereinafter called the feed main, starting from the Pinckney street main and running into the base of the tower, then turning upward and running into the bottom of the tank. As originally constructed in 1890 the supply of water to the tower was controlled by a valve in the feed main located inside the base of the tower just before the main turns upward. It appears, however, that as time went on this valve became very hard to open on account of the sweating of the upright pipe and the dripping of water and the consequent gathering of rust, and that in 1898 (not in 1891, as testified to in the *Piper Case*) it became impossible to close it, and the water commissioners of the city determined to and did discontinue its use, and placed a valve in the feed main at the northeast line of Pinckney street, 260 feet distant from the tower. This valve is called "valve A" in the case, and its position with reference to the water tower and the water system of the city will be easily seen by reference to the accompanying plat of the immediate surroundings. As will be seen by reference to the plat, the ten-inch feed main was laid somewhat to the southeasterly side of the street, while on the northwesterly side and some twenty feet distant was a six-inch main, from which service pipes ran to consumers along the street. There were no service pipes connected with the ten-inch main. Its function was simply to feed the standpipe or tower. Wash-

ington avenue was and is a business street, with shops and stores on each side, and the plaintiff's building was located, as

indicated on the plat, nearly opposite the middle of the feed main but somewhat nearer to the tower than to Pinckney

street, and the service pipes from the building ran across to the six-inch main.  Valves were also located in the water mains at the various street corners, so that, if necessary, the six-inch service main could be cut off from the balance of the water system, but in order to make the segregation complete it required the closing of nine valves.  There was in the bottom of the tank a two-inch waste pipe with a valve which could be opened by hand and which would discharge the water in the tank into a six-inch pipe connecting with the sewer system in three and one-half or four hours.  To turn this valve a man simply had to ascend the stairway in the base of the tower to the bottom of the tank.

On the morning in question, at about 7:15 o'clock, water was discovered flowing into the basement of the plaintiff's building through and around the basement windows, and the waterworks officials were at once notified.  Employees of the department were immediately sent to remedy the difficulty if possible, and arrived on the scene at about 7:30 o'clock.  After examining the flow of water the waterworks employees concluded that the escaping water probably came from a broken service pipe, and they first shut off valve A, controlling the feed pipe, and then, as rapidly as possible, closed the remaining eight or nine valves necessary to completely cut off the six-inch service pipe from the water system.  This took more than two hours, largely on account of the fact that it was winter and hence it required some time to locate and uncover the valves in the streets on account of accumulated snow and ice.  The valve in the waste pipe at the bottom of the tank was not opened by any one, because it was supposed that the break was in one of the service pipes or the six-inch service main.  The closing of the nine valves occupied something more than two hours, and within fifteen minutes thereafter, or at about 10 o'clock, the flow of water into the basement ceased.  The city employees then seem to have suspected that the break might be in the feed main, and they opened

valve A for a few moments and discovered that the flow commenced again. They then closed it, and proceeded to thaw out the ground over the feed main and dig down to it. On the third day they found a break in that main opposite the plaintiff's building, and it is not denied that the flood was caused by the escape of the water in the tank through the broken feed main.

The grounds of negligence relied on by the plaintiff were (1) the abandoning of the valve in the base of the water tower, and placing the sole controlling valve at a distance of 260 feet from the tower, and (2) the failure to empty the water tower by opening hydrants and reducing pressure, or by opening the two-inch waste pipe valve at once.

The following special verdict was returned by the jury:

"(1) Did the defendant fail to exercise ordinary care in abandoning the valve in the base of the water tower and in putting one in place thereof at Pinckney street? A. No.

"(2) After defendant knew that water was coming into the plaintiff's building, did the defendant fail to exercise ordinary care in stopping the water from flowing out of the broken pipe into plaintiff's building? A. No.

"(3) If you answer 'Yes' to either or both questions number 1 or number 2, was such want of ordinary care the proximate cause of the loss or damage resulting from the flooding of plaintiff's basement and vault? A. No.

"(4) What sum will measure the damage done by water from the broken water pipe, wholly excluding from this answer any damage done to the stereotype plates and boxes in the vault? A. No damage.

"(5) What sum will measure the damage done to the stereotype plates and the boxes in which they were contained? A. No damage."

On this verdict, after overruling motions made by each party for judgment on the verdict, the court set aside the verdict on the ground that it was perverse, and granted a new trial. From this order the defendant appeals.

For the appellant there were briefs by *John A. Aylward,*

city attorney, and *Aylward, Davies, Olbrich & Hill,* of counsel, and oral argument by *John A. Aylward.* They cited, among other authorities, *Piper v. Madison,* 140 Wis. 311, 122 N. W. 730; *McCarthy v. Syracuse,* 46 N. Y. 194; *Jenney v. Brooklyn,* 120 N. Y. 164, 167, 24 N. E. 274; *Chicago v. Selz, S. & Co.* 202 Ill. 545, 67 N. E. 386; *Rice v. St. Louis,* 165 Mo. 636, 65 S. W. 1002; *Hubbell v. Yonkers,* 104 N. Y. 434, 10 N. E. 858; *Lafflin v. Buffalo & S. W. R. Co.* 106 N. Y. 136, 12 N. E. 599; *Stringham v. Hilton,* 111 N. Y. 188, 18 N. E. 870; *Birmingham U. R. Co. v. Alexander,* 93 Ala. 133, 9 South. 525; *Pueblo Bldg. Co. v. Klein,* 5 Colo. App. 348, 38 Pac. 608; *Blyth v. Birmingham W. W. Co.* 11 Exch. 781; *Terry v. Mayor, etc.* 8 Bosw. 510; *Green v. Chelsea W. W. Co.* 70 L. T. Rep. 547; *Morgan v. Duquesne,* 29 Pa. Super. Ct. 100; *Rumsey v. Philadelphia,* 171 Pa. St. 63, 32 Atl. 1133; *Paris v. Tucker* (Tex. Civ. App.) 93 S. W. 233; *McCord R. Co. v. St. Joe W. Co.* 181 Mo. 678, 685, 81 S. W. 189; *Hunt v. Mayor, etc.* 109 N. Y. 134, 142, 16 N. E. 320; *Todd v. Cochell,* 17 Cal. 97; *Boughton v. Midland G. W. R. of I. Co.* 7 Ir. Rep. (C. L.) 169; *Kibele v. Philadelphia,* 105 Pa. St. 41; *Ettlinger v. New York,* 58 Misc. 229, 109 N. Y. Supp. 44.

For the respondent there was a brief by *Gilbert, Jackson & Ela,* and oral argument by *F. L. Gilbert* and *Emerson Ela.*

WINSLOW, C. J. In our judgment the court was entirely justified in setting aside the special verdict as perverse. There was no controversy in the case as to the fact that substantial damage had been suffered by the plaintiff and the trial court practically so instructed the jury, leaving only to them the question of the exact amount thereof. Disregarding the undisputed evidence, as well as the charge of the court, the jury affirmatively found that there was no damage. Where the answer to one material question of a special verdict plainly shows that the jury made the answer perversely

or by reason of passion or prejudice, the court may well set the entire verdict aside, and indeed should do so unless satisfied that the answers to the other questions were not affected by such perversity, passion, or prejudice. *Lines v. Milwaukee,* 147 Wis. 546, 133 N. W. 592. If this were the only question arising upon this appeal we should have no difficulty in affirming the order granting a new trial, but the defendant contends that there was no evidence of negligence in the case, and hence that no new trial should have been granted even if the verdict were perverse.

This contention presents a question of much greater difficulty, and requires a critical examination of the evidence bearing on the two claims of negligence.

In furnishing water to private consumers the city is acting in a private business capacity and not in its governmental capacity, and it is bound to exercise ordinary care, namely, that reasonable degree of care in view of the dangers involved which the great mass of ordinarily prudent persons engaged in the same or similar business would and do exercise under like circumstances. For any failure to exercise this degree of care, proximately causing injury to another, the city is liable to the same extent that a private person or a corporation operating a waterworks system is liable; no more and no less. 4 Dillon, Mun. Corp. (5th ed.) § 1670; Jones, Neg. Mun. Corp. § 40; *Jenney v. Brooklyn,* 120 N. Y. 164, 24 N. E. 274; *Piper v. Madison,* 140 Wis. 311, 122 N. W. 730, and cases cited therein.

The first claim in the present case is that the city officials were negligent in the matter of construction of the plant; that is, that the valve which controlled the supply of water to the elevated standpipe or tank in the water tower was negligently placed at a distance of 260 feet from the base of the tower, when it should have been placed, or another valve should have been placed, inside of the tower at the nearest practicable point to the angle where the feed pipe turns up-

ward.    It seems beyond question that had there been a valve
inside the base of the tower (as it was originally placed) and
maintained in working order, the contents of the tower would,
by the closing of the valve, have been prevented from flowing
into the basement of plaintiff's building.    However, it is very
evident that this is not the controlling question.    The ques-
tion is whether it was want of ordinary care to locate the
valve as it was located in 1898, and abandon the valve in the
tower, and, if so, whether that want of ordinary care was
the proximate cause of the injury.

The question of the location of the valves in a water system,
like many other questions, as, for example, the size and
strength of the pipes, the power and quality of the engines
and pumps, the location of the pumping station, etc., is a
question which manifestly cannot be safely determined by the
nonexpert layman.    When a private firm, or a corporation
composed of laymen, proposes to install a system of water-
works they must necessarily on all such questions consult ex-
pert hydraulic engineers and be guided by their advice.    We
assume that it will be admitted at once that this must be so,
and that any other course would not only constitute a lack of
ordinary care but an actual invitation to disaster.    No au-
thorities seem necessary to support so plain a proposition.
Such being the rule applicable to private firms or corpora-
tions, it must be held that the same rule applies to the city
when it enters this field.    It becomes *pro hac vice* a private
proprietary corporation and assumes the liabilities and obli-
gations of a private corporation so far at least as the exercise
of care is concerned.

It is very well known that there are many expert engineer-
ing problems upon which able and distinguished engineers do
not entirely agree.    The disagreement of doctors is prover-
bial, and the disagreement of experts in other lines of applied
science almost equally so.    When a practical question arises
with regard to the construction of a water system and there is

a disagreement between hydraulic engineers of acknowledged ability and repute as to the proper course to be pursued, the question becomes an important and delicate one, and especially so to the nonexpert layman who is investing large sums in the plant with the hope of future returns. He must choose one course or the other if he is to complete his enterprise. Each plan may be supported by acknowledged authorities in hydraulic engineering, and the weight of authority may be practically evenly balanced. What then is he to do? Is he guilty of negligence or want of ordinary care if, after careful investigation, he determines in good faith to adopt the plan proposed by one school of experts and reject the other, and at some distant day an accident happens which would have been avoided had the other plan been adopted? We cannot think so. To so hold would be to demand of the layman not merely extraordinary care, but practical omniscience on a technical and expert subject. He must accomplish the impossible or pay the penalty in damages. He must exercise more care than the man of extraordinary prudence can possibly exercise. If this question be answered in the negative it is very obvious that when an accident happens and the question arises whether there has been want of ordinary care in the construction of some part of the water system, resulting in damage to a third person, it must be competent for the owner of the system, whether such owner be a private firm or corporation, or the city itself, to show that in adopting the method attacked it acted in good faith upon the advice of competent and reputable experts, and only acted after it had taken such advice. This showing, if fully established, must constitute a defense because it affirmatively establishes the exercise of reasonable and ordinary care, and it cannot be overcome by a showing that some other experts, although of equal competency, would have advised or actually did advise a different course. *Service v. Shoneman,* 196 Pa. St. 63, 46 Atl. 292. This latter class of evidence is doubtless admissible

on the general question, and especially on the question whether the owner of the system acted in good faith on the advice received by him; but if such good-faith action, based upon the advice of competent and reputable experts, be established, the owner must be absolved from the charge of want of ordinary care. In the present case the city attempted to show by the testimony of the superintendent of the water system that when the valve in the base of the water tower became useless and practically incapable of movement from rust, in 1898, the water commissioners sought and obtained the advice of Mr. Edwin Reynolds of Milwaukee, an expert hydraulic engineer of acknowledged reputation, and that he advised the abandonment of that valve and the installation of a control valve outside the structure at or about the place where valve A was in fact located. This testimony was objected to and excluded, apparently upon the idea that it was held to be inadmissible in *Piper v. Madison,* 140 Wis. 311, 122 N. W. 730. While there are some expressions in that case which, if not carefully read in connection with the whole opinion, might seem to justify that idea, it is very certain that no such rule was laid down or contemplated in that case. The charge to the jury in that case was deemed to convey to the jury the idea that the city in building and operating waterworks to supply private consumers was exercising a purely governmental function, and hence, following the long line of cases beginning with the case of *Hayes v. Oshkosh,* 33 Wis. 314, was not liable for the negligent acts of its servants or agents in performing their duties. This was held to be an erroneous view of the case, and the city was held to be acting in a private capacity, just as an individual or private corporation would act doing the same business, and hence liable for the negligent acts of its servants and agents.

This is the sum and substance of the holding in the *Piper Case,* and it is manifest that it does not exclude the testimony which was offered in the present case concerning the consulta-

tion with Mr. Reynolds and the advice which he gave the water commissioners. This error was not prejudicial to the plaintiff, inasmuch as the jury returned a favorable answer to the question covering this point notwithstanding the exclusion of the evidence aforesaid, but as there must be a new trial of the case the question is considered necessary to be treated.

Even in the absence of this evidence, however, we have not been able to convince ourselves that there is any evidence in the record which would justify a verdict that there was any negligence proximately causing the plaintiff's injury in the location of the supply valve at the point A, 260 feet distant from the base of the tower.

The evidence bearing on the subject came from hydraulic engineers. Three engineers, called by the plaintiff, testified in substance that the supply valve should be placed within the foundation of the tower or immediately outside thereof, and that it was not good hydraulic engineering to place it at a distance of 260 feet, as it was placed in the present instance. Four engineers of apparently equal ability, called by the defendant, testified that the actual location of the valve accorded with the best engineering principles and practice. Practically all of the engineers agreed that the only possible added danger resulting from placing the valve where it actually was placed was the liability of a rupture in the 260 feet of pipe between the valve and the tower, and that this danger was so remote as to be practically negligible, because the pipe was not tapped by service pipes and was subjected to the least pressure of any pipe in the system on account of its being located on the highest point of ground.

It is quite apparent that a given method may not be the very best engineering, or even passable engineering, and yet there may be no added danger on that account; in fact there may be less danger. The construction of such a system may be clumsy, or the appliances and materials used unnecessarily heavy and ponderous, so that any engineer would condemn it

as not a good engineering job, and yet the very things which would condemn it as clumsy engineering might render the system practically incapable of rupture. So it cannot be considered that negligence is established by the mere statement or finding that the location of the valve was not in accord with the best engineering; it must also appear that because of this location at the place in question some material danger was added which was not present when the valve was located in the basement of the tower, and which proximately caused the injury complained of. We do not find the evidence in the record before us, as it now stands, which would justify any such finding. It is shown without dispute that the water system of *Madison* had been in operation about twenty-four years prior to the accident and has had an average of twenty-nine miles of mains in use during that time, and that there have been but three breaks in the mains during the whole period. On that basis the likelihood of a break in the 260 feet of ten-inch feed pipe aforesaid, which sustains the least pressure of any pipe in the system, and is not weakened by any tapping, is so remote as scarcely to be a substantial factor in the problem of location of the valve.

Upon another trial the evidence may be different, and the evidence now lacking on this point may possibly be supplied, but as now it stands we find nothing to justify a finding of negligence proximately causing the injury in the relocation of valve A.

With regard to the second ground of negligence claimed, to wit, that the water officials were guilty of negligence in not discharging the contents of the water tower by opening the waste-pipe valve, or by reducing the water pressure and opening fire hydrants in the vicinity, we have had considerably more difficulty. The question is by no means clear. There were circumstances which would quite strongly tend to justify the belief which the water officials had and on which they acted, namely, that the break was either in the six-inch serv-

ice main or in the service pipe therefrom, but, on the other hand, there was no certainty where it was and no present means of ascertaining. It might well be in the ten-inch feed main, and if so the opening of the two-inch waste pipe at the bottom of the tank was an obvious means of partial relief and one which could be performed in a few moments. There was also, it seems, another means of relief which would be effective whether the break were in the ten-inch feed pipe or in the six-inch service main, namely, the opening of two or three hydrants in the immediate vicinity and the lowering of the pumping pressure to thirty pounds. The testimony tended to show that by the opening of the waste-pipe valve alone the tank would probably have been emptied in an hour and a half as a result of the combined action of the waste pipe and the leak. The testimony also tended to show that by opening two six-inch hydrants in the immediate vicinity and reducing the pumping pressure to thirty pounds, the tank would probably have been emptied in about twenty minutes. Under these circumstances, while it is felt that the case is close to the border line, the court feels compelled to hold that upon this second claim of negligence there is under the evidence a question for the jury as to whether the water officials exercised ordinary care in meeting the difficulty when they spent nearly three hours in uncovering and shutting nine valves in order to cut off this part of the system from the rest.

It is suggested by respondent that the water tower is a nuisance, because it is erected in the public street, and that, irrespective of any other question in the case, it should be held that the city is liable for all damage caused by water escaping from it.

It is sufficient to say that no such claim of negligence was made in the complaint nor upon the trial. It is not within the issues as made by the pleadings, nor was it actually litigated. This renders it unnecessary to consider the question.

*By the Court.*—Order affirmed.