MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, Respondent, vs. CITY OF MILWAUKEE and another, Appellants.

*November 12—December 6, 1932.*

For the appellants there was a brief by *Max Raskin,* city attorney, and *Mark A. Kline,* assistant city attorney, and oral argument by *Mr. Kline.*

For the respondent there was a brief by *Shaw, Muskat & Paulsen* of Milwaukee, and oral argument by *Martin R. Paulsen*.

NELSON, J. The question for determination is whether the plaintiff or the defendant city should bear the expense of the removal and relocation of the plaintiff's electric conduits made necessary by the construction of a new water main in the intersection mentioned. In order that this controversy may be understood we deem it necessary to recite fully the facts.

On October 7, 1889, the common council of the city of Milwaukee passed an ordinance which purported to grant to Edison Electric Illuminating Company the right and authority "to construct and maintain in the streets, alleys, tunnels and public grounds of the city of Milwaukee, a line or lines of wires or other electric conductors to be used for the transmission of arc and incandescent lighting or such other system as the common council may approve for the purpose of furnishing light, heat, power and signals." Sec. 2 of said ordinance provided that "the lines in the districts hereinafter named (which included the intersection hereinbefore mentioned) shall be under ground," and further provided that "whenever said company shall desire to extend its lines in any of said districts over or along any street or alley of said city, it shall prepare a plan, showing the mode of extension proposed, and submit the same to the chief of the fire department and board of public works, who shall, if they approve the same, indorse their approval thereon, and the same shall be filed with the city clerk. If they do not approve such plan, they shall make such modification thereof as they deem proper and approve the same as modified, and the same as modified shall be filed with the city clerk, and such extension shall be made agreeably to the plan so ap-

proved and shall be constructed under the supervision of the board of public works or such other officer or department of the city government as may hereafter be designated by ordinance or by law to perform the said duty, or the duties of said board of public works." That ordinance was thereafter, on June 1, 1891, duly assigned to the Milwaukee Street Railway Company. On February 1, 1896, the property, rights, privileges, franchises, and ordinances of the previously mentioned railway company were duly conveyed to the plaintiff by the receivers of said railway company pursuant to the judgment and decree of the circuit court of the United States for the Eastern district of Wisconsin. Thereafter in 1905 four of the ducts in question were laid by the plaintiff and in 1909 eight additional ducts were laid, all pursuant to the authority granted by the ordinance of 1889. The ordinance of 1889 was non-exclusive.

On November 25, 1907, the common council of the city of Milwaukee passed another non-exclusive ordinance conferring certain rights and privileges upon the Continental Realty Company with respect to the laying of conduits and cables in the public streets for the purpose of furnishing heat, light, and power to the city for its use in public buildings, and to all persons and corporations who may desire to use the same. That ordinance among other things provided as follows:

"Section 2. Before entering upon or commencing the construction of any of its mains or tunnels, or any extensions thereof, in any highway, street, alley or avenue, the Continental Realty Company, its successors or assigns, shall furnish to the board of public works of this city a plan showing the streets, alleys and avenues or highways to be opened, and the proposed location of the installation therein, with specifications of the work to be done. The board of public works shall have the right to make any reasonable change in the location of such proposed installation, which change, if

made, shall be indicated in writing within twenty days after the receipt of the proposed plans of said company. . . . Provided further that if the grade of any street or alley be changed, said company shall cause its pipes to be relaid in conformity to such grade at its own expense and shall not be entitled to any compensation or damage by reason thereof. . . .

"Section 6. If any of the pipe lines, conduits and tunnels, constructed under the provisions of this ordinance, shall at any time in the future interfere with or obstruct any public works or improvements of any nature whatsoever, which said city, in its own behalf, may arrange to do and make, in or under said streets, avenues and alleys occupied by said pipe lines, conduits and tunnels, said city shall have, and hereby reserves the right and power, if same becomes necessary in order to install the work proposed, to cause the said grantee, or its successors and assigns, at their own cost and expense, to make such changes in their construction and in the location thereof as will permit such public works or improvements to be made by said city."

That ordinance was thereafter, on April 9, 1917, duly assigned to the plaintiff herein. Prior to the assignment just mentioned no conduits had been laid by the Continental Realty Company in the intersection mentioned. Whatever conduits then existed in said intersection had been laid by the plaintiff under the authority of the ordinance of 1889.

Prior to the year 1928 Cedar street was widened fifty feet between River street and the west line of Sixth street (which included the said intersection), and the grade thereof at Sixth street had been raised three and one-half feet.

The city of Milwaukee owns and operates its waterworks system as a public utility. On March 7, 1929, three resolutions were passed by the common council of the city. The first resolution confirmed the decision of the commissioner of public works to lay additional water mains in Cedar street; the second confirmed the decision of said commissioner that public convenience and necessity require a thirty-

inch main in Cedar street from Fourth to Sixth streets; and the third confirmed the decision of said commissioner that public convenience and necessity require a twelve-inch water main on Cedar street from the Milwaukee river to Sixth street. On July 16, 1928, a resolution was also passed directing the commissioner of public works to proceed with the paving of Cedar street between East Water street and the west line of Sixth street. The plaintiff was thereafter notified of the proposed work and that the water mains would interfere with the plaintiff's conduits. This controversy as to who should bear the expense of the removal and relocation of the plaintiff's conduits thereafter arose.

At the time of the trial the city clerk was unable to find any plans which had been prepared and submitted by the plaintiff to the chief of the fire department and to the board of public works relating to the laying of conduits in the years 1905 and 1909. No plans or permits relating to any extensions by any public utility operating in the city of Milwaukee prior to the year 1910 were found. That the extensions and conduits made by the plaintiff complied with proper engineering standards was not questioned; that the grade of the new water mains was necessary in order to carry out the plans of the city was conceded; that the raising of the grade of Cedar street at Sixth street did not necessitate the removal or relocation of the plaintiff's ducts seems not to have been disputed. On April 3, 1929, the department of public works of defendant city issued a permit to the plaintiff authorizing it to open a trench and dig a new manhole in said intersection for the purpose of laying additional ducts which were thereafter laid pursuant to said permit, on April 12, 1929. Thereafter on April 15, 1929, the department of public works addressed a letter to the plaintiff advising it that bids would be received on April 24, 1929, for widening and improving various streets in the city of Mil-

waukee including Cedar street and informing the plaintiff that if it had any work to do in any of the streets mentioned it should notify the department of public works and arrange for such work.

The trial court, after having given most careful and painstaking consideration to the questions involved in this controversy and to the several contentions of the defendants, held that the plaintiff's ducts and conduits were lawfully in the street pursuant to the authority given it by the ordinance of 1889; that the ordinance of 1907, which provided for a change in the location of any conduits which interfered with any public works or improvements to be made by the city in the future, was not controlling because the ducts in question were not in fact laid pursuant to that ordinance; that the waterworks system of the city of Milwaukee was a public utility operated by the city in its private or proprietary capacity; that the city had never, in the exercise of its police powers, enacted any ordinance requiring public utilities privately owned to remove and relocate their conduits in case of conflict or interference with water mains to be laid or constructed by the city; and that the city had no power or authority to remove or cause to be removed and relocated the plaintiff's conduits without just compensation.

This controversy involves some questions which are new to this court and which are important not only to the city of Milwaukee but also to the plaintiff.

Numerous contentions are made by defendants which attack the conclusions reached by the trial court. We shall give attention to such of them as in our opinion require consideration.

The defendants contend that the plaintiff's conduits and ducts were unlawfully in the street at the time it sought to compel the plaintiff to remove and relocate them, because the city clerk could find among his files no plans which had been

submitted to the chief of the fire department and the board of public works relating to the laying of the ducts in 1905 and 1909. The trial court found that no evidence introduced by the defendants was sufficient to overcome the presumption that such permits were obtained and that the ducts were lawfully laid pursuant to the ordinance of 1889. When it is considered that the ducts were laid in 1905 and 1909 in a prominently and centrally located intersection which involved the opening of a street, the inference seems unavoidable that the city must have had full knowledge of the work being done. Since no complaint is made that the ducts and conduits did not comply with proper and approved engineering standards, we think that defendants' contention that the plaintiff's ducts were unlawfully in the intersection is without merit.

The defendants further contend that since the Continental Realty Company franchise was assigned to the plaintiff in 1917, and since the occupancy of the street by the plaintiff's conduits under the ordinance of 1889 was unlawful, it should be held that the plaintiff was occupying the street under the Continental franchise, which specifically required the owner thereof to relocate its conduits when they interfered with public works or improvements to be made by the city. In view of what has already been said in connection with defendants' first contention, this contention fails to impress us. There is no evidence that any of the ducts in question were laid pursuant to the authority granted by the Continental franchise.

The defendants also contend that the city has priority of rights in its public streets by virtue of its charter powers which permit it to establish and maintain a waterworks system, and by virtue of its ownership and control of its public streets. That the city has the right to construct and install in its streets such water mains as it may deem neces-

sary for supplying water to its residents and for fire protection can give rise to no question. No authority need be cited to uphold that right. But this does not mean that a city may compel a public utility lawfully occupying a street pursuant to authority granted by it to relocate its property without just compensation, in the absence of a contract or agreement so requiring.

The defendants further contend that the occupation of a street by the public utility is subject to "reasonable regulation" and "terms and conditions." See secs. 196:58 (1), 180.17 (1), Stats. Assuming this to be true, no proof was offered of any resolution or ordinance which provided that a utility occupying a street should remove and relocate its conduits whenever they interfere with public improvements to be made by the city or whenever they interfere with the location of a proposed water main. It is argued that the resolutions passed in 1928 relative to the paving of Cedar street and the installation of the new water mains constituted reasonable regulations requiring the plaintiff to relocate its ducts. There is nothing in the resolutions mentioned to support such argument even assuming that the city has authority so to do.

We now come to the real question in this case: May the city, acting in its proprietary capacity, in the absence of a right retained by it in an applicable franchise, and in the absence of an ordinance requiring a public utility so to do, compel a public utility to relocate, at its own cost, such of its conduits as may interfere with the installation of new water mains?

That the water system of the city of Milwaukee is a public utility was decided in *Pabst Corporation v. Milwaukee,* 190 Wis. 349, 208 N. W. 493. That a city in constructing, maintaining, and operating a waterworks system does so in its proprietary capacity cannot now be questioned in this

state. *Piper v. Madison,* 140 Wis. 311, 122 N. W. 730; *State Journal Printing Co. v. Madison,* 148 Wis. 396, 134 N. W. 909; *Nemet v. Kenosha,* 169 Wis. 379, 172 N. W. 711; *Eau Claire Dells Imp. Co. v. Eau Claire,* 172 Wis. 240, 179 N. W. 2; *West Bend v. West Bend H. & L. Co.,* 186 Wis. 184, 202 N. W. 350.

In this action we have a situation where the construction plans of a public utility owned and operated by a city in its proprietary capacity interfere with the properties of another public utility lawfully occupying a street, which properties the city insists should be removed or relocated at the expense of its owner. In such a situation justice would seem to demand and the law seems clearly to require us to hold that such removal would amount to an appropriation of property without just compensation. *Los Angeles v. Los Angeles Gas & E. Corp.* 251 U. S. 32, 40 Sup. Ct. 76, 64 Lawy. Ed. 121; *New York & Queens E. L. & P. Co. v. City of New York,* 221 App. Div. 544, 224 N. Y. Supp. 564. In the *Los Angeles Case* it appeared that the plaintiff company operated an electric lighting system in the city of Los Angeles. The city later determined to construct and operate a lighting system of its own in competition with the lighting system owned and operated by the plaintiff. The city determined that it was necessary to go through and remove certain portions of the system used by the plaintiff. In that case it was held that the city of Los Angeles might not remove portions of the system belonging to the plaintiff therein without payment of compensation. In the *New York Case, supra,* the city was about to construct an elevated railroad upon one of its public streets. In so doing it became necessary to remove, change, and relocate some of the lines and cables owned by the plaintiff company. The question presented was whether the company or the city should bear the expense of such removal and relocation. The court held

that the city was acting in a proprietary capacity in the construction of the elevated railroad and that therefore the city was obligated to bear the expense of removing and relocating the company's lines. That case seems so pertinent to this controversy that we quote somewhat at length from the opinion:

"We think that in constructing the railroad in question the city was not acting in any governmental capacity, but was engaged in a proprietary enterprise of building a railroad. There is no contention on the part of the city that the removal and relocation of the plaintiff's wires was occasioned for any other purpose than the erection and operation of said railway. The demand by the city for the relocation of the plaintiff's poles and wires was upon the sole ground that it interfered with and prevented the construction and operation of the elevated railroad, and removal of everything interfering with or obstructing or preventing the construction of said municipal rapid transit elevated railroad was required to be expeditiously done so as not to cause delay in the construction of said municipal public improvement. No claim has been made that prior to the construction of said elevated road the poles, wires, and appliances of the plaintiff in any manner interfered with the ordinary and usual use by the public of said avenue.

"Unquestionably had such removal been required by a regrading of the street by the city or for any other purpose required for the use of the street by the public, the plaintiff, if required, would have been compelled, at its own cost and expense, to relocate its said poles and wires to conform with such changed conditions. The law is reasonably well settled that when the city engages in the construction of a rapid transit line it is not performing a governmental act, but acting in a proprietary capacity. *Re Rapid Transit R. R. Comm'rs,* 197 N. Y. 81, 90 N. E. 456, 36 L. R. A. N. S. 647, 18 Ann. Cas. 366; *Litchfield Construction Co. v. New York,* 244 N. Y. 251, 263, 155 N. E. 116. The position of the defendant in this respect would not be different than as though it were a private corporation or person. In the construction of this elevated railway it was not performing a governmental act. . . .

"The poles, wires, and appliances of the plaintiff in the avenue in question constituted property of which the plaintiff could not be deprived without just compensation. Unless the removal and relocation of said lines be made necessary for the usual use of the street by the public and compellable in a proper and reasonable exercise of the police power by the city in the exercise of governmental authority, the owner thereof cannot be compelled to remove or relocate the same without just compensation."

Numerous cases are cited by the defendants which hold that a city may compel a public utility to relocate its water mains or pipe lines whenever a city decides to change the grade of its streets. *State ex rel. Benwood v. Benwood & McMechen Water Co.* 94 W. Va. 724, 120 S. E. 918; *Jersey City Water Comm'rs v. Hudson,* 13 N. J. Eq. 420; *Springfield Water Co. v. Philadelphia & G. St. R. Co.* 45 Pa. Super. Ct. 516; *Roanoke Gas Co. v. Roanoke,* 88 Va. 810, 14 S. E. 665; *Moffat v. Denver,* 57 Colo. 473, 143 Pac. 577. Such is unquestionably the law; but in changing the grade of a street a city acts in its governmental capacity and not in its private or proprietary capacity.

One other contention of the defendants remains to be considered. The defendants contend that before the plaintiff laid certain ducts in this intersection in 1929, it was fully notified of the proposed location of the new water mains and that the same would interfere with the plaintiff's conduits at said intersection, the cost of removing which amounted to $49. While all of this is true, it also appears that the city, through its commissioner of public works, issued to the plaintiff a permit to lay said ducts in 1929. In this situation we think that the city should be held to be estopped from now claiming that the plaintiff did something which it should not have done.

*By the Court.*—Judgment affirmed.