MILWAUKEE METROPOLITAN SEWERAGE DISTRICT,
Plaintiff-Appellant,

v.

CITY OF MILWAUKEE, Defendant-Respondent-
Petitioner.

Supreme Court

*No. 02–2961. Oral argument September 10, 2004.—Decided
January 27, 2005.*

2005 WI 8

(Also reported in 691 N.W.2d 658.)

638

639

640

644

For the defendant-respondent-petitioner there were briefs by *Grant F. Langley, Susan E. Lappen, Rudolph M. Konrad,* and *Anne Berleman Kearney,* Milwaukee, and oral argument by *Rudolph M. Konrad.*

For the plaintiff-appellant there was a brief by *Michael J. McCabe* and *James H. Petersen,* Milwaukee, and oral argument by *James H. Petersen.*

An amicus curiae brief was filed by *Claire Silverman,* Madison, on behalf of the League of Wisconsin Municipalities.

¶ 1. JON P. WILCOX, J. The City of Milwaukee (the City) appeals from a published court of appeals decision, *Milwaukee Metropolitan Sewerage District v.*

*City of Milwaukee,* 2003 WI App 209, 267 Wis. 2d 688, 671 N.W.2d 346, reversing a Milwaukee County Circuit Court order, Mel Flanagan, Judge, that granted the City's motion for summary judgment.

## I. PROCEDURAL POSTURE

¶ 2. On December 13, 2000, Milwaukee Metropolitan Sewerage District (MMSD) filed a complaint in Milwaukee County Circuit Court to recover sums related to the repair and replacement of its metropolitan interceptor sewer (MIS) at North 40th Street and West Bluemound Road in Milwaukee, which allegedly collapsed on December 9, 1999, due to the rupture and collapse of the City's nearby water main.

¶ 3. MMSD's complaint alleged both negligence and nuisance. The complaint averred, relative to the negligence claim, that the City "did not properly monitor the volume of water through the pipeline, did not properly inspect the pipeline, did not notice the unusual water flows in the vicinity, and did not properly repair/replace the City's water main in the vicinity of North 40th Street and West Bluemound Road." With regard to the alleged nuisance, MMSD averred: "The City has, upon information and belief, permitted a nuisance condition to exist, to wit: the existence of broken water main, which nuisance caused the collapse of the District's MIS." MMSD also stated a cause of action for unjust enrichment, arising from its repair of the City's water main.

¶ 4. Following a stipulation of the parties, on May 8, 2002, the circuit court dismissed MMSD's claim for unjust enrichment. Shortly thereafter, the City filed a motion for summary judgment, seeking a dismissal of MMSD's remaining claims. In its motion, the City argued: 1) It had no notice of any alleged defect

regarding the water main; 2) It was not negligent because it did not breach any duty it owed to MMSD and did not cause MMSD's damages; 3) It was entitled to statutory immunity relative to both the nuisance and negligence claim; and 4) There was no nuisance. After briefing, a hearing was held on the motion in which the circuit court ruled: 1) The City did not have notice regarding the alleged defective condition, and such lack of notice was a viable defense to both the negligence and nuisance claims; 2) The City was entitled to immunity from the negligence and nuisance claims based on Wis. Stat. § 893.80(4) (1999–2000)[1] and related case law; and 3) MMSD's theory of res ipsa loquitur was not supported by the undisputed facts. Thus, on September 19, 2002, the circuit court entered judgment in favor of the City, thereby dismissing MMSD's remaining claims. Following a dispute concerning photocopying costs, the circuit court entered an amended judgment on October 22, 2002. MMSD appealed both the judgment and amended judgment.

¶ 5. The court of appeals reversed the circuit court, concluding notice was not required to prevail on a claim of private nuisance. *Milwaukee Metro. Sewerage Dist.,* 267 Wis. 2d 688, ¶¶ 14–16. The court of appeals stated that MMSD was alleging that the City created a nuisance. *Id.,* ¶ 11. The court of appeals also concluded that the City was not entitled to immunity from a nuisance suit based on *Winchell v. City of Waukesha,* 110 Wis. 101, 109, 85 N.W. 668 (1901), and several court of appeals decisions relying on *Winchell. Milwaukee Metro. Sewerage Dist.,* 267 Wis. 2d 688, ¶¶ 18–21. The court of appeals also concluded that under Wis. Stat.

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

§ 893.80(4), "while a cause of action alleging negligence is immunized, a nuisance created by negligent conduct is not protected . . . ." *Id.*, ¶ 22. Also, the court of appeals rejected the City's argument that public policy should limit liability. *Id.*, ¶ 23. Further, the court of appeals concluded that the circuit court's ruling regarding res ipsa loquitur was premature, although the court of appeals ultimately left it to the circuit court's discretion whether to give a jury instruction on the doctrine. *Id.*, ¶¶ 26–28. Finally, the court of appeals ruled that the circuit court erred in awarding photocopying costs to the City. *Id.*, ¶ 29.

¶ 6. For the reasons discussed below, we affirm the ultimate decision of the court of appeals that summary judgment should not have been granted, although we do so based on an entirely different rationale. We hold that in order to establish a prima facie case for liability for a nuisance, there must be proof of the nuisance, proof of the underlying tortious conduct giving rise to the nuisance, and proof that the tortious conduct was the legal cause of the nuisance. The alleged nuisance in this case is the City's interference with MMSD's property interest in its sewer.

¶ 7. We conclude that under the law governing liability for nuisance based on intentional conduct, the pleadings and record do not support any claim that the City intentionally created a nuisance. We conclude that the only actionable tortious act giving rise to the nuisance in this case is the City's alleged negligence in failing to repair its leaky water main before it burst. We reaffirm our existing case law that when a nuisance is predicated on negligence, all the usual rules and defenses applicable to negligence claims apply. Thus, when a nuisance is predicated on a negligent failure to act, there must be proof that the defendant's conduct

constituted actionable negligence, including proof of notice, regardless of whether the alleged nuisance is public or private.

¶ 8. Moreover, we hold that under § 893.80(4), and Wisconsin's immunity jurisprudence since *Holytz v. City of Milwaukee,* 17 Wis. 2d 26, 115 N.W.2d 618 (1962), a municipality may be immune from nuisance suits depending on the nature of the tortious acts giving rise to the nuisance. A municipality is immune from suit for nuisance if the nuisance is predicated on negligent acts that are discretionary in nature. A municipality does not enjoy immunity from suit for nuisance when the underlying tortious conduct is negligence and the negligence is comprised of acts performed pursuant to a ministerial duty.

¶ 9. Decisions concerning the adoption, design, and implementation of a public works system are discretionary, legislative decisions for which a municipality enjoys immunity. Thus, the City is immune from suit relating to its decisions regarding the adoption of a waterworks system, the selection of the specific type of pipe, the placement of the pipe in the ground, and the continued existence of such pipe. In contrast, the City may be liable for its negligence in failing to repair the leaky water main. However, since there exists a material issue of fact as to whether the City had notice of the leaking water main, we cannot determine whether the City was under a ministerial duty to repair its water main prior to the break. Thus, we cannot determine whether the City is immune under § 893.80(4) from liability predicated upon a negligent failure to repair the water main before it burst.

¶ 10. Finally, viewing the summary judgment materials in a light most favorable to MMSD, we conclude that there are at least two disputed issues of material

fact. In addition to the disputed issue of fact regarding whether the City had notice of the leaking water main prior to the break, there exists a disputed issue of fact as to what caused MMSD's sewer to collapse. Therefore, we affirm the decision of the court of appeals, reversing the circuit court's grant of summary judgment in favor of the City.

## II. FACTUAL BACKGROUND

¶ 11. The following is a brief summary of the facts giving rise to the complaint. Further facts will be set forth later in the opinion. On December 9, 1999, at approximately 4:45 a.m., a City of Milwaukee Waterworks employee responded to a call that water was entering the basement of a home near 40th Street and Bluemound Road. Shortly thereafter, City employees turned off two main gate valves in order to stop the flow of water. A City employee testified that the water main break was severe and that it caused substantial damage to the roadway above the water main. However, the water was not surfacing on the street. It was later discovered that a 12–to-15 foot section of the water main had completely snapped off and fell into the MIS. Another City employee testified that the MIS was sucking water and debris down into it, creating a large sloping cone-shaped hole in the ground. The broken water main was taken offline at 5:59 a.m. on December 9, 1999, and, following the installation of a gate valve, service was restored at 9:33 p.m.

¶ 12. The water main located at 40th and Bluemound was made of 8–inch diameter pit cast iron pipe, which was installed in 1926. The water main was buried approximately 12 feet into the ground. The MIS, also known as the Menomonee Special Sewer, was constructed out of brick in the 1880s. It was 60 inches

650

in diameter and was located below the City's water main. The MIS was buried approximately 23 feet into the ground and carried waste flowage from Miller Brewing Company. The MIS was not originally built as a sanitary sewer; it was originally designed as a "flushing line" to carry river water.

¶ 13. Mark Scheller, the Water Mains Design Engineer for the Milwaukee Waterworks, testified that the City operates approximately 1300 miles of pit cast iron pipe, the majority of which was laid before 1963.[2] Pit cast iron was the industry standard prior to 1945.[3] Since 1963, the City has utilized ductile iron pipe. In addition, the City currently utilizes modern industry practices such as rubber mechanical joints, limestone backfill, and polyethylene wrap to reduce the risk of corrosion in the pipes.

¶ 14. Mr. Scheller testified that the City does not have a systematic plan for replacing water mains. Rather, water mains are replaced based on their break history, water quality, and other variables. The City records and tracks data on water main breaks and maintains a searchable database of such information. The City is able to isolate a section of a main and rank

---

[2] Mr. Scheller stated in his affidavit that the majority of water main breaks occur in cast iron pipe that was laid after World War II. These mains were constructed from centrifugally cast iron pipe ("spun pipe"), and were installed between 1945 and 1963.

[3] In his affidavit, Mr. Scheller relayed a brief history of the use of cast iron pipes. Mr. Scheller stated that cast iron pipe was first installed in Germany in 1455 at the Dillenburg Castle. Apparently, Louis XIV of France ordered the construction of a 15–mile cast iron pipeline in France in 1664 that is still in service today. Several cities in the United States have cast iron water mains that have been in service for at least 150 years.

it based on its break history. The Waterworks Department replaces as many mains as it can, given the funds allocated to it every year. Thus, when a water main breaks, the City replaces the break area and not the entire service line. The estimated cost of replacing each mile of cast iron main is $1,000,000. Given the City's 1300 miles of cast iron pipe, the cost to replace the entire system is estimated at $1,300,000,000. Because of the high cost of replacing an entire water main, such mains are replaced only when they have suffered a sufficient number of breaks and attendant problems.

## III. STANDARD OF REVIEW

¶ 15. This court reviews a circuit court's grant of summary judgment independently, but we apply the same methodology as the circuit court. *Smaxwell v. Bayard,* 2004 WI 101, ¶ 12, 274 Wis. 2d 278, 682 N.W.2d 923. Pursuant to Wis. Stat. § 802.08(2), summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, "[s]ummary judgment should not be granted, 'unless the facts presented conclusively show that the plaintiff's action has no merit and cannot be maintained.' " *Smaxwell,* 274 Wis. 2d 278, ¶ 12 (quoting *Goelz v. City of Milwaukee,* 10 Wis. 2d 491, 495, 103 N.W.2d 551 (1960)).

¶ 16. In addition, "[w]e view the summary judgment materials in the light most favorable to the nonmoving party." *Id.* If there is no dispute concerning the material facts, this court is presented solely with a

question of law. *Id.* Whether there is a legal basis for a nuisance claim is a question of law subject to de novo review. *Stunkel v. Price Elec. Coop.,* 229 Wis. 2d 664, 668, 559 N.W.2d 919 (Ct. App. 1999).

## IV. ANALYSIS

¶ 17. The City argues that contrary to the court of appeals' decision, this case does not involve the creation of a nuisance. The City asserts that its water main was not a nuisance when installed and that an old water pipe does not constitute a nuisance so long as the useful life of the pipe has not expired. The City explains that MMSD's claim is one for maintenance of a nuisance. The City notes that in its complaint, MMSD alleged that the City "permitted a nuisance condition to exist."

¶ 18. The City further argues that in order to succeed on a claim for maintenance of a nuisance, MMSD must prove causation and that it cannot do so given the record in this case. In addition, the City asserts that the court of appeals incorrectly concluded that it was not entitled to raise a defense of notice. According to the City, notice is an essential part of a claim for maintenance of a nuisance. The City notes that MMSD has stipulated that the City did not have actual notice of any leak or defect in its pipe. Further, the City states that there is no evidence that it had constructive notice of such a condition.

¶ 19. Moreover, the City argues that the court of appeals incorrectly concluded that it was not entitled to discretionary immunity under case law and § 893.80(4). The City asserts that it is entitled to immunity for any decisions regarding the design and placement of the pipe. In addition, it maintains that it has immunity for decisions relating to the repair and replacement of water mains because updating the water main system is

a legislative act. Finally, the City asserts that it should be relieved of any liability based on public policy grounds.

¶ 20. In contrast, MMSD argues that the City intentionally created a nuisance by failing to inspect its water mains and adopting a system whereby it merely repairs obsolete pipes that have a history of breaking. MMSD argues that the City intentionally continues to use inferior quality water mains until they can no longer be repaired economically. MMSD states that there is a material issue of fact as to causation. MMSD also asserts that notice is not a prerequisite to liability when a nuisance claim involves the invasion of property interests. MMSD further maintains that negligence is not a prerequisite to liability in a private nuisance case because liability is based on the violation of an absolute duty.

¶ 21. MMSD argues that even if notice were a prerequisite to liability, it has established a prima facie case for notice. MMSD asserts that the City once utilized a system of pressure testing water mains that it has since abandoned. In addition, MMSD notes that the water main in question has a history of breaking, as it had previously ruptured in 1988 and 1989. Further, MMSD emphasizes that the record indicates that a construction project occurred in 1992–93 directly above the water main in question and that City documents indicate that due to some construction problems that may have damaged the water main, the City was to inspect the water main but never did so.

¶ 22. Moreover, MMSD contends that by the 1970s the City was aware that the water main in question was constructed with inferior material and the City did nothing to alleviate the risk that the main might break. MMSD also provides a number of statis-

tics relating to the break rate of the City's water mains and the rate of water loss from the system and contends the City was aware that a break was almost certain to occur unless it replaced its old cast iron pipes.

¶ 23. Furthermore, MMSD argues that the court of appeals correctly determined that the City was not entitled to immunity under either the common law or § 893.80(4). MMSD contends that the City had a ministerial duty to maintain its water mains so that they did not cause damage to other property. MMSD argues that it is well-established law that municipal immunity does not extend to claims for nuisance. Finally, MMSD argues that public policy supports holding the City liable for nuisances that invade the property interests of others.

A. Nuisance Defined: Private and Public Nuisance

■

¶ 24. The first step in any nuisance analysis is to determine whether a nuisance actually exists. *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2002 WI 80, ¶ 27, 254 Wis. 2d 77, 646 N.W.2d 777. It has been said that "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie." W. Page Keeton et al., *Prosser and Keeton on Torts* § 86, at 616 (5th ed. Lawyers ed. 1984)[hereinafter *Prosser and Keeton on Torts*]. However, the term "nuisance" generally refers to the invasion of either an interest in the use and enjoyment of land or a common public right. *See id.,* § 86, at 618; Restatement (Second) of Torts, Introductory Note to §§ 821–49 (1977). This court has defined a nuisance as follows: "A nuisance is

655

a condition or activity which unduly interferes with the use of land or of a public place." *Physicians Plus,* 254 Wis. 2d 77, ¶ 21.

██

¶ 25. At the outset, it is imperative to distinguish between a nuisance and liability for a nuisance, as it is possible to have a nuisance and yet no liability. A nuisance is nothing more than a particular type of harm suffered; liability depends upon the existence of under-lying tortious acts that cause the harm. The Restate-ment (Second) of Torts illustrates this point:

> [F]or a nuisance to exist there must be harm to another or the invasion of an interest, but there need not be liability for it. *If the conduct of the defendant is not of a kind that subjects him to liability . . . the nuisance exists, but he is not liable for it.*

Restatement (Second) of Torts § 821A cmt. c (emphasis added).[4]

---

[4] Wisconsin has explicitly adopted the definition of private nuisance found in the Restatement (Second) of Torts, § 821. *Vogel v. Grant-Lafayette Elec. Coop.,* 201 Wis. 2d 416, 423, 548 N.W.2d 829 (1996); *Prah v. Maretti,* 108 Wis. 2d 223, 231, 321 N.W.2d 182 (1982). Wisconsin's definition of public nuisance also comports with the Restatement (Second) of Torts § 821B. *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.,* 2002 WI 80, ¶ 21 n.15, 254 Wis. 2d 77, 646 N.W.2d 777. In addition, Wisconsin has adopted the Restatement (Second) of Torts § 822. *Vogel,* 201 Wis. 2d at 428; *CEW Mgmt. Corp. v. First Fed. Sav. & Loan Ass'n,* 88 Wis. 2d 631, 633, 277 N.W.2d 766 (1979); *Stunkel v. Price Elec. Coop.,* 229 Wis. 2d 664, 668, 599 N.W.2d 919 (Ct. App. 1999); *Fortier v. Flambeau Plastics Co.,* 164 Wis. 2d 639, 676, 476 N.W.2d 593 (Ct. App. 1991); Wis JI-Civil 1920 Comment (2004). This court has also previously relied on other

¶ 26. Much of the confusion in nuisance law results from a "[f]ailure to recognize that . . . nuisance has reference to the interest invaded and not to the type of conduct that subjects the actor to liability." Restatement (Second) of Torts § 822 cmt. b. Thus, a cause of action in nuisance is predicated upon a particular type of injurious consequence, not the wrongful behavior causing the harm. *Physicians Plus,* 254 Wis. 2d 77, ¶ 22 n.18. While it is necessary to prove the underlying tortious conduct before liability may attach for a nuisance, it is incorrect to speak of nuisance "as itself a type of liability-forming conduct . . . ." Restatement (Second) of Torts § 822 cmt. c. As such, the first step in a nuisance analysis is proof of the particular harm that defines a nuisance—the interference with a private interest in the use and enjoyment of land or with a public right. *See Physicians Plus,* 254 Wis. 2d 77, ¶¶ 27–28.

¶ 27. Nuisances come in two varieties, public and private, which are distinguished by the nature of the interest invaded. "The essence of a private nuisance is an interference with the use and enjoyment of land." *Prosser and Keeton on Torts* § 87, at 619. *See also Krueger v. Mitchell,* 112 Wis. 2d 88, 103, 332 N.W.2d 733 (1983); Restatement (Second) of Torts § 821D; Restatement (Second) of Torts § 822 cmt. c. Since a private nuisance is "broadly defined to include any disturbance of the enjoyment of property[,]" *Prah v. Maretti,* 108 Wis. 2d 223, 232, 321 N.W.2d 182 (1982), an action to

sections of the Restatement governing nuisances. *See, e.g., Vogel,* 201 Wis. 2d at 423–32 (applying Restatement (Second) of Torts §§ 825, 840).

recover damages for a private nuisance may be brought by those who "have property rights and privileges in respect to the use and enjoyment of the land affected," including possessors of the land and owners of easements. Restatement (Second) of Torts § 821E.

¶ 28. In contrast, "[a] public nuisance is a condition or activity which substantially or unduly interferes with the use of a public place or with the activities of an entire community." *Physicians Plus,* 254 Wis. 2d 77, ¶ 21. In other words, "[a] public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B. *See also Prosser and Keeton on Torts* § 86, at 618 (accord). Therefore, the interest involved in a public nuisance is broader than that in a private nuisance because "a public nuisance does not necessarily involve interference with use and enjoyment of land." Restatement (Second) of Torts § 821B cmt. h.

¶ 29. It should be stressed that the distinction between a private and public nuisance is "not the number of persons injured *but the character of the injury and of the right impinged upon." Costas v. City of Fond du Lac,* 24 Wis. 2d 409, 414, 129 N.W.2d 217 (1964)(emphasis added). *See also Physicians Plus,* 254 Wis. 2d 77, ¶ 21; *Schiro v. Oriental Realty Co.,* 272 Wis. 537, 546, 76 N.W.2d 355 (1956). "Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons. There must be some interference with a public right." Restatement (Second) of Torts § 821B cmt. g. Since the term public nuisance refers to a broader set of invasions than private nuisance, "[a] nuisance may be both public and private in charac-

ter. . . . A public nuisance which causes a particular injury to an individual different in kind and degree from that suffered by the public constitutes a private nuisance." *Costas,* 24 Wis. 2d at 413–14. *See also* Restatement (Second) of Torts § 821B cmt. h (accord).

¶ 30. In sum, a nuisance exists if there is a condition or activity that unduly interferes with the private use and enjoyment of land or a public right. If the interest invaded is the private use and enjoyment of land, then the nuisance is considered a private nuisance. Conversely, if the condition or activity interferes with a public right or the use and enjoyment of public space, the nuisance is termed a public nuisance. *Physicians Plus,* 254 Wis. 2d 77, ¶ 21 n.14, ¶ 28; *Schiro,* 272 Wis. at 546. While there initially was some confusion over whether the nuisance in this case was public or private, this confusion was due to a typographical error in one of the briefs and the parties agreed at oral argument that the nuisance alleged here is a private nuisance, as it involves an interference with MMSD's property interest in its sewer.

¶ 31. We emphasize that the alleged nuisance in this case is the invasion of MMSD's property interest in its sewer line. The fact that the City's water main system as a whole may be comprised of older pipes, some of which have a history of leaking and breaking, is not germane to the issue of whether a nuisance exists in this case. The actionable nuisance here is not the City's water main "system"; rather, the actionable nuisance is the City's interference with MMSD's sewer, which was allegedly caused by a leaky water main located at 40th and Bluemound. Having set forth the definition of nuisance and determined that this case involves a

private nuisance, we next examine the elements necessary to hold an actor liable for a private nuisance.

## B. Elements of a Private Nuisance Claim

■

¶ 32. The Restatement (Second) of Torts provides the following elements for liability for a private nuisance:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent . . . conduct . . . .

Restatement (Second) of Torts § 822.[5] *See also* Wis JI-Civil 1920. Therefore, after it is established that a nuisance exists, the next step in a nuisance analysis is determining whether there is any liability-forming conduct. Proof of the underlying tortious conduct is an essential element in a nuisance analysis. *Stunkel,* 229 Wis. 2d at 671 ("[W]e conclude that no claim for private nuisance may be made without the underlying prerequisite conduct being proved."). As we stated in *Physicians Plus:* "[L]iability is 'founded on the wrongful act in . . . creating or maintaining [the nuisance].' " *Physicians Plus,* 254 Wis. 2d 77, ¶ 27 (quoting *Brown v. Milwaukee Terminal Ry. Co.,* 199 Wis. 575, 589, 227 N.W. 385 (1929)).

---

[5] The Restatement also allows for liability based upon the rules governing reckless conduct or abnormally dangerous conditions. Restatement (Second) of Torts § 822. Neither of these two types of conduct are present in the case at bar.

¶ 33. Liability for a nuisance may be based upon either intentional or negligent conduct. *Physicians Plus,* 254 Wis. 2d 77, ¶ 20; *Schiro,* 272 Wis. at 546; Restatement (Second) of Torts § 822. Much of the confusion in this case results from the parties' dispute over whether the City "created a nuisance" or "maintained a nuisance" and the differing standards of liability for each classification. In *Brown,* 199 Wis. at 589, this court noted that one may be liable for nuisance for either creating or maintaining the nuisance. In *Brown,* we stated that "[i]n those cases where the nuisance is created by the defendant, no question of negligence or want of ordinary care is involved." *Id.* at 589. As we explained in *Brown,* this rule applies in cases such as "a tannery or a slaughter-house in the midst of a residential area, where the mere act of using the plant creates the nuisance." *Id.* In these cases, liability " 'does not rest on the degree of care used, for that presents a question of negligence, but on the degree of danger existing even with the best of care.' " *Id.* (quoted source omitted). In cases where the defendant is "engaged in intentional conduct that severely affect[s] the neighbor's peaceful use and enjoyment of their property[,]" *Stunkel,* 229 Wis. 2d at 670, "[a] finding of intentional but unreasonable conduct, even though lawful, is sufficient to meet the requirements of the Restatement under subsection (a)." *Id.*

¶ 34. In contrast, *Brown* noted a "class of cases in which the acts or conduct of the defendant do not necessarily cause damage to others." *Brown,* 199 Wis. at 589. Such cases involve changes to otherwise benign objects that develop over time and become harmful, through no fault of the owner of the object. *Id.* at

589–90. In these cases, liability is predicated upon the defendant's failure to remove the harmful condition after he has notice of its existence. *Id.* at 590.

■

¶ 35. The Restatement (Second) of Torts § 824, while not using the terms "creating" or "maintaining," provides that an individual is liable for an "act" or "failure to act" that results in a nuisance. Restatement (Second) of Torts § 824. Consistent with *Brown,* the Restatement (Second) of Torts provides that when liability is predicated on a "failure to act," there must be proof that the actor was "under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest." *Id.* Thus, liability for a nuisance is dependent upon the type of underlying tortious conduct that causes the nuisance, be it an act or failure to act in circumstances where there is a duty to act. *CEW Mgmt. Corp. v. First Fed. Sav. & Loan Ass'n,* 88 Wis. 2d 631, 634–36, 277 N.W.2d 766 (1979)("In any tort, the tortfeasor's liability follows from either his act or a failure to act when he has a duty to do so.").

¶ 36. Therefore, labeling a case as one involving the "creation" of a nuisance or the "maintenance" of a nuisance before one has examined whether the tortious acts causing the nuisance were negligent or intentional begs the question. *See Schiro,* 272 Wis. at 546–47 (noting that liability for nuisance is determined by the rules governing liability for the underlying tortious conduct and not the label the plaintiff places on a cause of action). As such, in order to determine whether one is liable for a nuisance, it must be determined whether there is any underlying liability-forming tortious conduct and whether such conduct is intentional or negli-

gent. Only then may the case be classified as one involving the "creation of a nuisance" or the "maintenance of a nuisance."

¶ 37. We now examine whether the City may be liable for the alleged nuisance based on the rules governing liability for either intentional or negligent conduct.[6] An interference with another's interest in the use and enjoyment of land is deemed to be "intentional" if the actor "(a) acts for the purpose of causing it, or (b) knows that it is resulting or is substantially certain to result from his conduct." Restatement (Second) of Torts § 825.[7] Thus, a nuisance is based on intentional conduct when the defendant, through ill will or malice, intends to cause the interference or if the defendant, without any desire to cause harm, nonetheless has knowledge that his otherwise legal enterprise is causing harm or is substantially certain to cause the invasion at issue. *Vogel v. Grant-Lafayette Elec. Coop.*, 201 Wis. 2d 416, 430–31, 548 N.W.2d 829 (1996).

¶ 38. It is important to clarify that when a nuisance is alleged to fall under the second category of intentional conduct, the "knowledge" requirement refers to knowledge that the condition or activity is causing harm to another's interest in the use and

---

[6] In addition to its numerous arguments regarding the City's intentional conduct in its brief, Petr's Br. at 17–20, 23–24, at oral argument, counsel for MMSD specifically argued that should the case be remanded, it was free to proceed either on a theory of intentional or negligent nuisance. Thus, it is necessary to address the prerequisites for liability for both an intentional nuisance and a negligence-based nuisance.

[7] This court has previously applied Restatement (Second) of Torts § 825. *Vogel,* 201 Wis. 2d at 430–31.

enjoyment of land. *Vogel,* 201 Wis. 2d at 431 (noting that "the invasion under the Restatement must be in another's interest in the use and enjoyment of land, not merely an invasion in the land"). Thus, in *Vogel,* a case involving stray voltage alleged to have damaged a farmer's cows, this court stated that it was not sufficient that the defendant knew that some stray voltage invaded the farmer's land; rather, proof was required that the defendant knew that unreasonable levels of the stray voltage were causing harm to the plaintiff's cows. *Id.* at 432–33.

¶ 39. Here, there is absolutely no evidence, nor does MMSD allege, that the City installed the water main in 1926 for the purpose of interfering with MMSD's use and enjoyment of its easement or with knowledge that such interference was substantially certain to occur.[8] In addition, there is no evidence that the City failed to inspect its pipes for the purposes of interfering with MMSD's sewer. Also, because MMSD has conceded that the City had no actual knowledge of any leak at the point where MMSD's interceptor sewer was located, there is no evidence that the City was actually aware that MMSD's sewer was being damaged or was substantially certain to be damaged by it water main. While we discuss the issue of constructive notice later in the opinion, for purposes of the present discussion, "[i]t is not enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing the invasion." Restatement (Second) of Torts § 825 cmt. c. Rather, in order for an invasion to be intentional, the

---

[8] "It is the knowledge that the actor has at the time he acts or fails to act that determines whether the invasion resulting from his conduct is intentional or unintentional." Restatement (Second) of Torts § 825 cmt. c.

664

actor "must either act for the purpose of causing it or know that it is resulting or is substantially certain to result from his conduct." *Id.*

¶ 40. In sum, there is no evidence that the City intentionally created a nuisance—that is, an interference with MMSD's use and enjoyment of its sewer. This is not a case where the nuisance condition is created by the very nature of the defendant's activities and operations, such as the case with a slaughterhouse or tannery. Rather, the allegations in the present case are more analogous to the second class of cases identified in *Brown* and the Restatement's provisions regarding a failure to act. Water mains are generally beneficial to property owners. It is only when, over time, through the natural process of corrosion and the City's negligence in repairing and maintaining its mains that the pipes leak, break, or otherwise create a condition that interferes with the private use and enjoyment of property.

¶ 41. Indeed, the plaintiff's own complaint establishes that the allegations in this case involve the negligent failure of the City to act. The complaint specifically alleges that "[t]he City . . . *permitted a nuisance condition to exist,* to wit: the existence of [a] broken water main, which nuisance caused the collapse of the District's MIS." (Emphasis added.) The initial act in laying the water main did not give rise to a cause of action; rather it is the City's alleged negligence in failing to act and repair a leak in the water main that ultimately damaged MMSD's sewer and gave rise to the cause of action. *See CEW Mgmt.,* 88 Wis. 2d at 635–36 (illustrating that defendant's actions did not give rise to a claim for nuisance until such conduct resulted in an interference with plaintiff's property). Thus, the court

of appeals erred in concluding that this case involved the intentional creation of a nuisance.

¶ 42. Having determined that the nuisance in this case is premised on the City's alleged negligence in failing to repair its leaky water main—that is, failure to abate a nuisance—we turn now and examine the requisite elements for liability for a nuisance based on negligent conduct. As noted *supra,* the failure to distinguish between a nuisance and the wrongful conduct necessary to establish liability for the nuisance has resulted in much confusion in the area of nuisance law. In particular, there has been much confusion surrounding the relationship between nuisance and negligence. In *Physicians Plus,* this court noted the confusion regarding these two concepts and sought to clarify the relationship between the two. *Physicians Plus,* 254 Wis. 2d 77, ¶ 20.

¶ 43. In *Physicians Plus,* we recognized that the concepts of negligence and nuisance overlap when a nuisance is predicated on negligent conduct, *id.,* 254 Wis. 2d 77, ¶ 27, but nonetheless stressed that the two concepts are distinct: " 'The point is that nuisance is a result and negligence is a cause . . . .' " *Id.,* ¶ 27 n.22 (quoting *Culwell v. Abbott Constr. Co.,* 506 P.2d 1191, 1196 (Kan. 1973)); *See also CEW Mgmt.,* 88 Wis. 2d at 636. In other words, "nuisance has reference to the interest invaded and negligence to the conduct that subjects the actor to liability for the invasion." Restatement (Second) of Torts § 822 cmt. b. As such, "a person may not recover damages from a private unintentional nuisance in the absence of underlying negligent . . . conduct . . . or activities." *Stunkel,* 229 Wis. 2d at 667. *See also* Restatement (Second) of Torts § 822 cmt. c.

¶ 44. Therefore, an essential element of a private nuisance claim grounded in negligence is proof that the underlying conduct is "otherwise actionable under the rules controlling liability for negligent . . . conduct." Restatement (Second) of Torts § 822. *See also Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 676, 476 N.W.2d 593 (Ct. App. 1991)(plaintiff's claim for private nuisance could proceed to the extent it was based on common-law negligence). A corollary to this principle is that when a nuisance is grounded solely on negligent acts, there is no need to separately analyze a cause of action for negligence and nuisance because the negligence is but the tortious conduct upon which liability for the result—the nuisance—depends. Where an alleged nuisance is not based upon intentional conduct, " '[i]t necessarily follows that if there was no negligence there was no nuisance.' " *Lange v. Town of Norway*, 77 Wis. 2d 313, 321, 253 N.W.2d 240 (1977)(quoting *Raisanen v. City of Milwaukee*, 35 Wis. 2d 504, 514–15, 151 N.W.2d 129 (1967)). Thus, when the plaintiff's complaint does not allege intentional conduct and negligence is not properly proved, the " '[p]laintiff add[s] nothing to the sufficiency of the complaint by his allegations of nuisance.' " *Id.* (quoting *Raisanen*, 35 Wis. 2d at 514). *See also Bratonja v. City of Milwaukee*, 3 Wis. 2d 120, 126–27, 87 N.W.2d 775 (1958)(ruling that where cause of action is predicated upon negligent conduct "the designation 'nuisance' is a mere label, adding nothing to the case asserted on the basis of negligence").[9]

---

[9] Therefore, we reject MMSD's contention that it may proceed on a negligence theory even if it fails to establish liability for nuisance.

¶ 45. Since proof of negligence is essential to a negligence-based nuisance claim, our courts have repeatedly held that when a nuisance claim is predicated upon negligence, the usual defenses in a negligence action are applicable. *See, e.g., Vogel,* 201 Wis. 2d at 425; *Stunkel,* 229 Wis. 2d at 669–70. In *Physicians Plus,* we noted that prior case law had established that when a nuisance is founded on negligent conduct, " 'the defendant should be accorded the same defenses that would be available in any other action grounded upon negligence.' " *Physicians Plus,* 254 Wis. 2d 77, ¶ 25 (quoting *Schiro,* 272 Wis. at 546). Thus, we ruled that when a claim is made that the defendant negligently maintained a nuisance, notice and causation are required to establish liability. *Id.,* ¶ 20.[10]

¶ 46. MMSD argues that notice is not required in an action for private nuisance and emphasizes that *Physicians Plus* was a public nuisance case. However, since the principal difference between a public and private nuisance lies in the nature of the interest violated or affected by the wrongful conduct, the elements required to establish liability for either are virtually identical. *Id.,* ¶ 21 & n.14, ¶ 25 n.21 (explaining the difference between a public and private nuisance and noting the similarity in analyses for public and private nuisance); Restatement (Second) of Torts

[10] We reject MMSD's contention that notice is not required because liability for a nuisance is based on the violation of an absolute duty. As correctly noted by the court of appeals in *Stunkel,* 229 Wis. 2d at 670, while some older cases suggest a strict liability analysis, these cases are all consistent with the Restatement's provisions regarding intentional and unreasonable conduct.

§ 821B cmt. e (stating that liability for public nuisance is governed by the same rules applicable to liability for private nuisance).

¶ 47. In addition, while *Physicians Plus* was indeed a public nuisance case, *Physicians Plus* specifically quoted our earlier decision in *Schiro,* for the proposition that when a nuisance is premised on negligent conduct, the defendant is entitled to all the usual defenses to negligence. *Physicians Plus,* 254 Wis. 2d 77, ¶ 25. *Schiro* itself involved a private nuisance. *Schiro,* 272 Wis. at 545. Since all the underlying rules of negligence are applicable to a claim of nuisance based on negligence, *Schiro,* 272 Wis. at 546; *Vogel,* 201 Wis. 2d at 425; *Stunkel,* 229 Wis. 2d at 669; Restatement (Second) of Torts § 822 & cmt. h, logically then, the prerequisites for liability should not vary depending upon whether the interest invaded by the defendant's negligent conduct is public or private.

¶ 48. Here, MMSD alleges that the City was negligent in failing to repair the water main before it broke. As discussed *supra,* in *Brown* we specifically stated that when liability for a nuisance is predicated upon a failure to act (failure to abate a nuisance), notice of the defective condition is a prerequisite to liability. *Brown,* 199 Wis. at 589–90. The Restatement (Second) of Torts § 824 provides that no liability for nuisance can attach based on a failure to act unless the actor was under a duty to act—that is, unless he has knowledge or notice of the nuisance condition. Further, in *Schiro,* 272 Wis. at 546–47, we noted that when a nuisance is premised on negligent conduct, failing to allow the defendant the same defenses as he would have in a negligence action would render liability dependent on the label the plaintiff used on the pleading and not the defendant's

669

underlying conduct. We therefore conclude that notice is a necessary part of the plaintiff's proof in an action for nuisance when liability is predicated upon the defendant's alleged negligent failure to act, regardless of whether the nature of the harm is public or private.

¶ 49. In sum, in order to maintain an action for a private nuisance, there must be proof that there exists an invasion or interference with the private use and enjoyment of land, the defendant's conduct was the legal cause of the invasion, and the defendant's conduct is actionable under the rules relating to intentional or negligent conduct. When liability for a nuisance is predicated upon negligent conduct, it is necessary to establish both the existence of a private nuisance—an interference with the private use and enjoyment of land—and that the conduct causing the harm is actionable under the rules governing liability for negligent conduct, including notice.

C. Governmental Immunity

¶ 50. Before addressing whether MMSD has established a prima facie case for a negligence-based nuisance, we must first consider the question of governmental immunity.[11] MMSD argues that under the common law, a municipality is never immune from nuisance suits involving the invasion of a private inter-

---

[11] Because we have concluded that the record does not support a claim of nuisance based on intentional conduct, we consider only whether the City is immune from liability for a negligence-based nuisance. We do not consider whether immunity would apply to a claim of nuisance premised on conduct that would constitute an intentional tort. *But see, Lange v. Town of Norway,* 77 Wis. 2d 313, 320–21, 253 N.W.2d 420 (1977);

est in land, whereas the City argues that it enjoys immunity in this case under § 893.80(4) because all the acts complained of are legislative or quasi-legislative acts. Both parties are incorrect.

¶ 51. The starting point for an analysis of the common-law immunity of a governmental entity for nuisance is the much cited case of *Winchell,* 110 Wis. at 103–04, where the plaintiff, a riparian landowner, alleged the defendant had created a nuisance through the installation of a sewage system that defiled the waters adjoining her land. The court held that the city was subject to the same liability as an individual would be, *id.* at 110, stating, "legislative authority to install a sewer system carries no implication of authority to create or maintain a nuisance, and that it matters not whether such nuisance results from negligence or from the plan adopted." *Id.* at 109. Numerous other older cases routinely found that governmental entities were liable in negligence or nuisance for damage caused by various public works. *See, e.g., Stockstad v. Town of Rutland,* 8 Wis. 2d 528, 532–34, 99 N.W.2d 813 (1959); *State Journal Printing Co. v. City of Madison,* 148 Wis. 396, 397, 403–04, 134 N.W. 909 (1912); *Piper v. City of Madison,* 140 Wis. 311, 314–15, 122 N.W. 730 (1909).

¶ 52. In these early cases, immunity questions were decided based on the rule that a governmental entity was generally immune from suits in tort unless it was deemed to be engaged in a "proprietary function" or the relation between the governmental entity and the plaintiff was not that of "governor to governed." *See Holytz,* 17 Wis. 2d at 32, 36. In the landmark decision of *Holytz,* the court abandoned the older distinctions be-

*Salerno v. Racine,* 62 Wis. 2d 243, 245, 214 N.W.2d 446 (1974); *Envirologix Corp. v. City of Waukesha,* 192 Wis. 2d 277, 288, 531 N.W.2d 357 (Ct. App. 1995).

tween proprietary and governmental functions in relation to government immunity. *Id.* at 39.[12] The court abrogated the general rule of governmental immunity for municipalities, stating: "henceforward, so far as governmental responsibility for torts is concerned, the rule is liability—the exception is immunity." *Id.* However, the court retained an immunity exception for the liability of a municipality for acts done "in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions." *Id.* at 40.

¶ 53. Following *Holytz*, the legislature enacted Wis. Stat. § 331.43 (1963), which is currently codified as § 893.80(4).[13] We recognized in *Lange,* 77 Wis. 2d at 314–18, that this statute codified the holding in *Holytz* regarding immunity for legislative, judicial, quasi-legislative, and quasi-judicial acts. Wisconsin Stat. § 893.80(4) provides:

> No suit may be brought against any . . . political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency . . . for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

---

[12] While several court of appeals decisions have relied on these earlier cases, in *Holytz v. City of Milwaukee,* 17 Wis. 2d 26, 39, 115 N.W.2d 618 (1962), this court clearly rendered obsolete the logic upon which the immunity determinations in these cases were based.

[13] The legislature changed the statutory numbering to Wis. Stat. § 895.43 in 1965, and Wis. Stat. § 893.80 in 1979. *See* § 2, ch. 66, Laws of 1965; § 29, ch. 323, Laws of 1979. The pertinent language in the statute has remained unchanged throughout its renumbering.

¶ 54. We have recognized that § 839.80(4) "immunizes against liability for legislative, quasi-legislative, judicial, and quasi-judicial acts, which have been collectively interpreted to include any act that involves the exercise of discretion and judgment." *Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 21, 253 Wis. 2d 323, 646 N.W.2d 314. *See also Envirologix Corp. v. City of Waukesha,* 192 Wis. 2d 277, 288, 531 N.W.2d 357 (Ct. App. 1995)("The terms 'legislative, quasi-legislative, judicial or quasi-judicial' are synonymous with the term 'discretionary.' ")(internal citation omitted). In contrast, we have recognized that the second clause of § 893.80(4) affords no protection to a municipality for nondiscretionary or "ministerial" acts:

> A ministerial act, in contrast to an immune discretionary act, involves a duty that "is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion."

*Willow Creek Ranch, L.L.C. v. Town of Shelby,* 2000 WI 56, ¶ 27, 235 Wis. 2d 409, 611 N.W.2d 693 (quoting *C.L. v. Olson,* 143 Wis. 2d 701, 711–12, 422 N.W.2d 614 (1988)(quoting *Lister v. Bd. of Regents,* 72 Wis. 2d 282, 301, 240 N.W.2d 610 (1976))).

¶ 55. Following *Holytz* and the enactment of the immunity statute, this court decided *Lange,* 77 Wis. 2d at 314,[14] where the plaintiff alleged that a town negli-

---

[14] Prior to *Lange,* this court decided *Costas v. City of Fond du Lac,* 24 Wis. 2d 409, 411, 129 N.W.2d 217 (1964), where the plaintiffs brought an action against a city to abate a private nuisance caused by gases emanating from the city's sewage

gently maintained a dam and that the operation of the dam constituted a nuisance because it caused the waters of a nearby lake to back up and flood his lands. Reviewing the circuit court's order dismissing the plaintiff's complaint, the court addressed the immunity statute and recognized that the statute was enacted by the legislature in response to the *Holytz* decision. *Id.* at 317 n.3. The court concluded that under the immunity statute, the town was immune from any liability predicated upon its acquisition of the existing dam or construction of a new dam because "these are clearly legislative functions under the statute." *Id.* at 318.

¶ 56. Reviewing several immunity cases decided since the passage of the statute, the court concluded that while the town enjoyed immunity in regard to "the size of the dam acquired and the capacity of its floodgate," immunity did not extend to claims arising from negligence in operating or maintaining the existing dam. *Id.* at 318–20. The court held that immunity "would not include a failure to maintain as to a condition of disrepair or defect or a failure to operate said floodgate." *Id.* at 320. Finally, the court stated that if the nuisance was based upon negligence in operating and maintaining the dam, acts to which immunity did not apply, there was no need to separately analyze the nuisance question from the negligence question as

---

disposal plant. The court concluded that a city has no immunity for the "plan adopted" for a public works system. *Id.* at 416. However, *Costas* is not controlling on this point, as its holding was based on *Winchell v. City of Waukesha,* 110 Wis. 101, 109, 85 N.W. 668 (1901), which predated *Holytz* and the enactment of the immunity statute. Notably, the court in *Costas* did not even mention the *Holytz* decision or the newly enacted immunity statute, Wis. Stat. § 331.43 (1963).

" 'nothing is added' by terming the required negligence to 'as such' constitute maintaining a public nuisance." *Id.* at 321.

¶ 57. In *Allstate Insurance Co. v. Metropolitan Sewerage Commission,* 80 Wis. 2d 10, 12, 258 N.W.2d 148 (1977), the plaintiffs' insureds were injured in an automobile accident resulting from a truck operated by the defendant that was discharging effluent into a sewer system and blocking traffic. The complaint alleged that the defendant was negligent in "designing and placing the manhole when it knew or should have known" that its use would block traffic and it failed to take precautions to prevent the blocking of traffic. *Id.* at 14. The dispostive issue on appeal was whether immunity barred any of the claims against the various defendants. *Id.* at 14–15. The court concluded that all the alleged acts or failures to act by the various municipal corporations "were either legislative or quasi-judicial and, as such, [were] immune under sec. 895.43, Stats." *Id.* at 18.

¶ 58. In so holding the court ruled that decisions in "planning and designing the system in question, including the placement of the manhole, were legislative acts. *Id.* at 15. The court stated that *"[w]here, when and how to build sewer systems are legislative determinations imposed upon a governmental body." Id.* at 16. (Emphasis added.) Further, the governmental entity that approved the plans was acting in either a legislative or quasi-judicial capacity when approving such plans. *Id.* Moreover, the court ruled that so long as the manhole was placed at a location in compliance with the sewer plans, its placement was an act in compliance with a legislative act that was also subject to immunity. *Id.* The court ruled that these initial planning and implementation decisions were covered by immunity

even though the "subsequent use of the manhole may have created a danger." *Id.*[15]

¶ 59. Therefore, it is clear that under the law since *Holytz* and the enactment of the immunity statute that a municipality *may* be liable for a nuisance founded upon negligent acts. *Lange,* 77 Wis. 2d at 320.[16] Whether immunity exists for nuisance founded on negligence depends upon the character of the negligent acts. If the acts complained of are legislative, quasi-legislative, judicial, or quasi-judicial—that is discretionary—the municipality is protected by immunity under § 893.80(4). *Lodl,* 253 Wis. 2d 323, ¶ 21; *Allstate,* 80 Wis. 2d at 18; *Lange,* 77 Wis. 2d at 318. Conversely, immunity does not apply if the negligence involves an act performed pursuant to a ministerial duty. *Willow Creek,* 235 Wis. 2d 409, ¶ 27; *Allstate,* 80 Wis. 2d at 16–17. Thus, when analyzing claims of immunity under § 893.80(4) for

---

[15] Therefore, the holdings in *Allstate Insurance Co. v. Metropolitan Sewerage Commission,* 80 Wis. 2d 10, 15, 258 N.W.2d 148 (1977), and *Lange,* 77 Wis. 2d at 318, 321, based upon the predecessor to § 893.80(4), effectively overruled, *sub silencio,* the language in *Costas,* 24 Wis. 2d at 416, that a city has no immunity for the "plan adopted" for a public works system. As noted *supra,* this language from *Costas* was based on law that predated *Holytz* and the immunity statute. Conversely, both *Lange* and *Allstate* were post-*Holytz* decisions whose holdings were based on the express language in the immunity statute.

[16] *See also Chart v. Dvorak,* 57 Wis. 2d 92, 100–01, 203 N.W.2d 673 (1973)(ruling that once a governmental body makes a legislative or quasi-legislative decision to install a highway sign, it is under a duty to maintain such sign without negligence); *Dusek v. Pierce County,* 42 Wis. 2d 498, 505, 167 N.W.2d 246 (1969)(noting that a municipality may be liable for failure to maintain highway signs after *Holytz*).

nuisances, the proper inquiry is to examine the character of the underlying tortious acts.[17] Finally, when a nuisance is grounded solely upon negligent acts, there is no need to separately analyze the immunity question for both negligence and nuisance because liability for the nuisance cannot be established without proof of negligence. *Lange,* 77 Wis. 2d at 321 (citing *Raisanen,* 35 Wis. 2d at 514–15).[18]

---

[17] Several court of appeals decisions, upon which the parties in this case rely, have applied the immunity statute to a variety of nuisance claims involving sanitary and storm sewers and have utilized conflicting rationales to reach results that are not entirely consistent. *See, e.g., Welch v. City of Appleton,* 2003 WI App 133, 265 Wis. 2d 688, 666 N.W.2d 511; *Anhalt v. Cities and Vills. Mut. Ins. Co.,* 2001 WI App 271, 249 Wis. 2d 62, 637 N.W.2d 422; *Menick v. City of Menasha,* 200 Wis. 2d 737, 547 N.W.2d 778 (Ct. App. 1996); *Hillcrest Golf & Country Club v. City of Altoona,* 135 Wis. 2d 431, 400 N.W.2d 493 (Ct. App. 1986)[hereinafter *Hillcrest*].

To the extent these decisions have created confusion in the area of municipal immunity for nuisances, such confusion is a result of three factors. First, some decisions have continued to rely on immunity jurisprudence that predated *Holytz* and § 893.80(4). *See, e.g., Hillcrest,* 135 Wis. 2d at 438–41. Second, some decisions employ separate analyses for negligence and nuisances grounded in negligence. *See, e.g., Welch,* 265 Wis. 2d 688, ¶¶ 8–13. Third, some decisions fail to stress that a municipality is liable for its negligent acts only if those acts are performed pursuant to a ministerial duty. *See, e.g., Anhalt,* 249 Wis. 2d 62, ¶ 26.

Focusing the immunity analysis on the character of the tortious acts underlying the nuisance is important for two reasons. First, as discussed *supra,* liability for nuisance is itself dependent upon whether the underlying tortious conduct is actionable. Second, and more importantly, Wis. Stat. § 893.80(4) does not immunize municipalities for certain *results;* rather, immunity is provided for certain *acts.*

[18] Thus, the court of appeals in the instant case misstated

¶ 60. Applying these rules to the facts of the present case, it is clear that decisions regarding the adoption, design, and implementation of public works are discretionary, legislative or quasi-legislative acts subject to immunity. *Allstate,* 80 Wis. 2d at 15–17; *Lange,* 77 Wis. 2d at 317–18. "Approval of the design and construction of a [public work] are generally discretionary acts . . . . Even if the system is poorly designed, a municipal government is immune for this discretionary act." *Welch v. City of Appleton,* 2003 WI App 133, ¶ 13, 265 Wis. 2d 688, 666 N.W.2d 511. Therefore, the City is immune from suit relating to its decisions concerning the adoption of a waterworks system, the selection of the specific type of pipe, the placement of the pipe in the ground, and the continued existence of such pipe. These are discretionary legislative decisions.[19]

¶ 61. The only act for which the City may be potentially liable is its failure to repair the leaking water main. As MMSD has not alleged that the City was negligent in failing to repair the main *after* it broke, the question then becomes whether the City was under a

the law when it concluded that § 893.80(4) immunizes a municipality from a cause of action alleging negligence but not a nuisance claim that is based in negligence. *Milwaukee Metro. Sewerage Dist.,* 2003 WI App 209, ¶ 22, 267 Wis. 2d 688, 671 N.W.2d 346.

[19] As in *Allstate,* 80 Wis. 2d at 16 n.5, we express no opinion as to "whether municipal immunity attached to the planning function should persist in view of subsequent experience or changed conditions which demonstrate an actual and substantial danger." That is, we do not determine whether a governmental entity has "a duty to review its legislative determination[s] after notice that a dangerous condition exists[.]" *Id.*

ministerial duty to repair the leaking main *before* it broke. As noted *supra,* a duty is ministerial "only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister,* 72 Wis. 2d at 301.

¶ 62. Having reviewed the record, we determine that the facts of the present case are not sufficiently developed for us to determine whether the City was under a ministerial duty to repair the leaking main prior to its break on December 9, 1999. As will be discussed below, there is a material issue of fact as to whether the City had notice of the leaking water main prior to its break. Since we cannot determine whether the City was on notice that its water main was leaking and could potentially interfere with the use and enjoyment of another's property, we cannot conclude whether its duty to repair the leaking main with reasonable care before it broke was "absolute, certain and imperative," *Lister,* 72 Wis. 2d at 301, or whether the City's decision not to repair the main before the break was discretionary. As such, we cannot determine whether the City is entitled to governmental immunity under § 893.80(4) based on the record before us. Thus, the circuit court must consider this issue on remand.

D. Summary Judgment

¶ 63. Having determined that the only actionable claim in this case is one for negligently failing to abate a nuisance, we lastly examine whether the circuit court properly granted summary judgment in this case. As we previously discussed, in order to prevail on a claim of nuisance based on negligence, the plaintiff must prove

679

the following elements: 1) The existence of a private nuisance—the interference with another's interest in the private use and enjoyment of land; 2) The defendant's conduct is the legal cause of the private nuisance; and 3) The defendant's conduct is otherwise actionable under the rules governing liability for negligent conduct, including notice. Here, MMSD has established the first element—an interference with its interest in the use and enjoyment of its MIS line. The parties contest whether there are any disputed issues of material fact relating to causation and notice of the leaky pipe. We will discuss the causation issue first and then examine the notice issue.

1. Causation

¶ 64. With regard to causation, the court of appeals in *Menick v. City of Menasha*, 200 Wis. 2d 737, 747, 547 N.W.2d 778 (Ct. App. 1996), correctly noted that a negligence-based nuisance requires proof of causation, which may require expert testimony if falling outside the realm of ordinary experience and comprehension. Viewing the summary judgment materials in a light most favorable to MMSD, we believe that there is a genuine issue of material fact relating to causation. There is clearly conflicting testimony in the record relating to the cause of the water main break and the MIS collapse.

¶ 65. Throughout the course of this litigation, the parties have disputed whether the water main broke first causing the MIS to collapse or whether the MIS collapsed first, thereby causing the City's water main to fracture and break. Prior to the incident in this case, MMSD had engaged the Rust/Harza firm to investigate the Central MIS system in order to evaluate its current condition and recommend improvements. An employee

of Rust/Harza who investigated the MIS collapse, Patrick Murray, stated in his deposition that the MIS sewer "is in poor condition and susceptible to failure." However, Mr. Murray later signed an affidavit retracting this part of his deposition testimony. A MMSD employee, Larry Osieczonek, testified that he inspected the MIS the day of the water main break and observed water to be flowing normally through the MIS. Timothy Bate, a MMSD engineer, stated that prior to the collapse, the MIS was functioning normally and that while it was old, MMSD had no information to suggest that the MIS was in any danger of collapse.

¶ 66. During the course of its investigation of the MIS collapse, MMSD procured and examined soil samples from the break site. MMSD also sent the broken portion of the water main to a lab for analysis. Steven DeMuth, one of MMSD's named experts, inspected and tested the section of the broken pipe at a laboratory to determine if there were any fractures in the pipe and the age of any such fractures. He testified that the pipe looked "in very good condition" for its age. He found some graphite corrosion in the pipe but opined that the corrosion was relatively recent and "seemed very minor." He also stated that he saw "no reason that this pipe would go in for replacement." In addition, he was unable to find any internal flaw in the piping materials.[20]

¶ 67. Another MMSD expert, Steven Fradkin, a geologist, testified that there was no clear answer as to whether the MIS collapsed first causing the water main to break or whether the water main cracked first.

---

[20] After analysis, the lab discarded the pipe. Thus, the City did not have an opportunity to have its own experts examine the pipe.

However, he testified that given the age of the MIS, it was likely that there had been movement of its bricks. This testimony was contradicted by a Rust/Harza geo-technical engineer, Steven Hunt, who testified that the MIS was located in stable material and "wasn't at great risk of becoming unstable" due to soil breaching the brick. In contrast, Mr. Hunt indicated that the soil surrounding the water main was corrosive.[21]

¶ 68. Ronald Heuer, another MMSD expert who examined boring samples taken of the soil in the break area, testified that there was a "strong," "more than reasonable" likelihood that the MIS collapse was triggered by the water leakage from the City's water main. However, when pressed he would not say his opinion was rendered "to a reasonable degree of scientific certainty." Yet, he stated that the soil under the water main was loose and that the downward movement of this soil eventually caused the break in the main.

¶ 69. Similarly, Mr. Murray stated in his deposition that following an examination of the broken water main, "he could not state with certainty what caused either the MIS or water main to fail." However, he further noted that while both pipes were old and susceptible to failure, the "age of the water main fractures and the time of the collapse tends to point to the water main failing first."

¶ 70. Douglas Chisholm, another MMSD expert, testified that the fracture in the pipe existed somewhere between .8 and 2.6 years and that the pipe was leaking over this period of time. However, he could not state when the pipe actually broke. Mr. Chisholm testi-

---

[21] Mr. Scheller stated in his affidavit that the City changed the material it used as fill during the main installation process to limestone in the 1970s to reduce the risk of water main corrosion.

fied that the water main was subjected to some outside force that caused the breach in the water pipe. When asked about the initial cause of the fracture, Mr. Chisholm stated that it was possible that the pipe was damaged as a result of a nearby construction program that took place sometime in 1992–93.[22] Mr. Chisholm testified that old cast iron pipe is "enormously susceptible to outside force" and that it is important to monitor or replace old cast iron pipe; yet, he was aware of no evidence that the pipe began to crack when the 1993 construction project took place. Mr. Heuer testified that "[t]he disturbance related to that construction activity could be an explanation for why the water main was fractured."

¶ 71. However, the City's water main design engineer, Mr. Scheller, stated in an affidavit that while the contractors on the 1993 construction project experienced some problems near the location of the 8–inch water main, "there is no documentation whatsoever which establishes that the . . . construction project caused any damage to the 8 inch water main." Mr. Scheller testified that "[t]here is no indication in any record that the collapse of the supporting wall caused any damage to the water main located in the area." Mr. Scheller stated that since this construction project ended, "there have been no complaints, repairs, or any problems documented whatsoever, with reference to any water main" in the area in question.

---

[22] This construction project related to renovation work done on the Wisconsin Avenue Bridge. Apparently, during the construction project, a wall supporting a "duct package" collapsed 20 feet from the water main in question. The contractors subsequently repaired the duct package by adding extra support to it.

¶ 72. Viewing the summary judgment materials in a light most favorable to the nonmoving party, MMSD, we conclude that there exists a disputed issue of material fact relating to causation. In addition, the court of appeals' decision leaves open the possibility that the circuit court can issue an instruction on res ipsa loquitur. *Milwaukee Metro. Sewerage Dist.*, 267 Wis. 2d 688, ¶ 26.

2. Notice

¶ 73. MMSD's complaint alleges that the City's failure to repair a leaky water main resulted in the collapse of their MIS. In order to survive summary judgment, there must be evidence in the record such that a reasonable jury could find that the City had notice of the leaky pipe and was therefore negligent in failing to repair it. Notice of the nuisance condition may be either actual or constructive. *Physicians Plus*, 254 Wis. 2d 77, ¶ 29; Restatement (Second) of Torts § 839 (A possessor of land is liable for failing to abate a nuisance if he "knows or should know of the condition and the nuisance.").[23] In *Walley v. Patake*, 271 Wis. 530, 542–43, 74 N.W.2d 130 (1956), we stated that in an action for maintaining a nuisance, there must be proof that the condition causing the nuisance existed long enough that the defendant knew or should have known

---

[23] However, the duty to abate "is not an absolute duty to prevent harm to others at all costs, but merely a duty to do what is practicable and reasonably under the circumstances." Restatement (Second) of Torts § 839 cmt. e. In addition, the condition must be reasonably susceptible to being abated. Restatement (Second) of Torts § 839 cmt. f.

of the condition and could have remedied it within a reasonable amount of time. MMSD has agreed that the City did not have actual notice of the leaky water main. Thus, we must determine whether the summary judgment materials, viewed in a light most favorable to MMSD, would allow a reasonable fact-finder to conclude that the City had constructive notice—that is, should have known—of the leaky pipe.

¶ 74. Generally, constructive notice "may arise from any observable condition existing over a period of time [that is] indicative that a leak has or is likely to occur." C.T. Drechsler, Annotation, *Liability of Water Distributor for Damage Caused by Water Escaping from Main*, 20 A.L.R. 3d 1294, § 11 (1968)[hereinafter *Liability of Water Distributor*]. *See also* 78 Am. Jur. 2D *Waterworks and Water Companies* § 61 (2003)(accord). The constructive notice requirement is important in this context because a water main is a closed conduit buried several feet below the street that is not readily susceptible to inspection in the same manner as a sewer. *Republic Light & Furniture Co. v. City of Cincinnati*, 127 N.E.2d 767, 772 (Ohio Ct. App. 1954). Another court has noted that if a city were under an absolute duty to constantly dig up its streets and examine its pipes without any notice of a problem, "[t]he expense of maintaining a system under those circumstances would be such as to make the cost of supplying water prohibitive." *Brown & Son, Inc. v. City of Grand Rapids*, 251 N.W. 561, 562–63 (Mich. 1933).

¶ 75. MMSD sets forth four arguments as to why constructive notice is present in this case. First, MMSD argues that the main in question was leaking for up to two years before it ruptured and that the City should have learned of the leak during this time. As noted, one of MMSD's experts testified that the fracture in the pipe

existed somewhere between .8 and 2.6 years and that the pipe was leaking over this period of time. Mr. DeMuth concluded that the fractures in the pipe were recent, as they had probably existed for only a few weeks or months. Mr. Heuer testified that the leakage from the water main was a gradual process and that while he could not quantify the rate at which water was escaping, he noted there were several fractures in the pipe that indicated water was probably leaking from the pipe for a number of years.

¶ 76. The problem with MMSD's reliance on the above testimony is that while it establishes the length of time in which the water main was leaking, it does not establish that the City should have been aware of the leak. Our cases have established that when a nuisance action is grounded in negligence and there is no actual knowledge of the condition that interferes with the use and enjoyment of land, there must be proof demonstrating "the existence of the condition resulting in [the] alleged nuisance for a sufficient length of time so that the defendants knew or ought to have known of it, and could within a reasonable period have remedied it." *Walley,* 271 Wis. at 543. The *Walley* court further stated that there can be no liability for nuisance in these circumstances when there has not been a showing "that the condition had been maintained over an unreasonable period of time." *Id.* at 542. Stated differently, it must be shown that "the defendant failed to act under circumstances in which it had a duty to take positive action to prevent the invasion of the plaintiff's property." *CEW Mgmt.,* 88 Wis. 2d at 636–67.[24]

---

[24] *See also* Restatement (Second) of Torts § 839 cmt. i ("What the possessor should know, therefore, depends first upon

¶ 77. Mr. Heuer specifically testified that the leak was not visually identifiable until the main had completely ruptured. He stated that at the critical early stages of the main failure, there would have been no physical manifestation of the problem at street level: "[T]he critical things started much earlier at a time when you can't see anything on the surface." He testified that by the time any problem visually manifested itself on the surface, the collapse was in process and it would have been too late to do anything about it: "By that stage, it's all over . . . . And there's nothing you can do now, just get out of the way and let it stabilize, and then you can go back and do something."[25] There is no testimony that the City should have discovered the leaky pipe through the exercise of ordinary care solely because the leak existed for up to two years.

¶ 78. MMSD's second argument is that the City should have conducted periodic inspections or tests of its water mains in the exercise of ordinary care and, had it done so, it would have discovered the condition of the leaky pipe. MMSD argues that the City once employed a system of pressure testing its pipes and that it

whether his land is in such condition that he, as a reasonable man, would be led to believe that it might be in a harmful condition and that an inspection of it was necessary.").

[25] "[B]ecause a water distributor is not an insurer against liability resulting from defective mains, but is only liable for its negligence, no liability may attach for damage from a broken main if it is shown that, upon notice of the leak, the water distributor took all reasonable measures to locate the defect and repair it." 78 Am. Jur. 2D *Waterworks and Water Companies* § 60. *See also* C.T. Drechsler, Annotation, *Liability of Water Distributor for Damage Caused by Water Escaping from Main,* 20 A.L.R. 3d 1294, § 10b (1968)(accord).

recently abandoned this system, electing to simply repair mains once they break.

¶ 79. There are several flaws in MMSD's second argument. First, as noted above, the uncontroverted testimony from one of MMSD's experts establishes that there would have been no observable indications that the pipe was leaking until it broke. He stated that the leak would not have visually manifested itself until it was too late to inspect and correct the problem. While a City employee responding to the scene of the break noticed a large depression in the road, there is no evidence that such condition exited before the water main burst.[26] "Most courts agree that in the absence of some circumstances tending to indicate a defective condition, a water distributor is not actionably negligent by failing to regularly dig up and inspect buried water mains." *Liability of Water Distributor,* 20 A.L.R. 3d 1294, § 9. *See also* 78 Am. Jur. 2D *Waterworks and Water Companies* § 60 ("In the absence of circumstances tending to indicate a probable deficiency, a water main distributor is not negligent in failing to conduct regular inspections of its mains."). Rather, a waterworks operator's duty to inspect and repair arises *"[a]fter notice of a leak likely to cause damage." Liability of Water Distributor,* 20 A.L.R. 3d 1294, § 10 (emphasis added).[27] Thus, there must be proof of facts that would lead a reasonable waterworks operator to conclude that there was a harmful condition on its property that

[26] Constructive notice giving rise to a duty to inspect and repair may be found when there is "[p]ersistent wetness and surface depressions in the ground over the main." 78 Am. Jur. 2D *Waterworks and Water Companies* § 61.

[27] Those jurisdictions that do impose an absolute duty upon a waterworks operator to inspect buried pipes do so because

would, in the course of ordinary care, require an inspection. Once such a condition is shown, the operator is charged with constructive notice of any nuisance condition that would have been discovered in the course of a reasonable investigation. Restatement (Second) of Torts § 839 cmt. i.

¶ 80. The above discussion leads to the second deficiency in MMSD's argument, that is, there is an utter lack of testimony in the record concerning the appropriate standard of care for a waterworks operator and whether this standard includes periodic pressure testing. Regarding constructive notice and the duty to inspect, in *Kunz v. City of Wauwatosa*, 6 Wis. 2d 652, 657, 95 N.W.2d 760 (1959), we stated that when a cause of action is based on negligently maintaining a nuisance, "[i]n order to substantiate a claim of nuisance it must be shown that the dangerous condition existed long enough so that by the exercise of ordinary care the defendant should have discovered the danger and removed it before the accident." There are simply no depositions, affidavits, or other testimony in the record that establish that the exercise of reasonable care for a waterworks operator includes periodic pressure testing of water mains.

¶ 81. In addition, the City argues that such a system of pressure testing is not feasible. The City states that its water mains are all pressurized and operate in a grid, such that there is pressure constantly in the system. It contends that pressure testing is dangerous, undermines the structural integrity of pipes, and would require the loss of service to its customers. MMSD has put forth no evidence as to

they hold such operators strictly liable under nuisance law for any leaks in the system. *See, e.g., Lubin v. Iowa City,* 131 N.W.2d 765, 770 (Iowa 1964).

whether other municipalities regularly pressure test their pipes, the cost of such testing, the dangers involved, whether such testing is commonplace, and whether such testing would require extended loss of service to customers. Such matters are obviously beyond lay comprehension such that expert testimony would be required to establish that periodic pressure testing is feasible and part of the exercise of ordinary care for a reasonable waterworks operator. *See Olfe v. Gordon,* 93 Wis. 2d 173, 180–82, 286 N.W.2d 573 (1980).

¶ 82. Were there testimony that a reasonable waterworks operator would, through the exercise of ordinary care, periodically pressure test its mains and would discover leaks in the system through such pressure testing, we would agree that the City's failure to pressure test its mains combined with the length of existence of the leak in question could constitute constructive notice of the leaking main. However, nothing approaching this type of testimony appears in the record.

¶ 83. Further, there is simply no evidence in the record that the City ever regularly employed a system of pressure testing its pipes. According to a journal article written in the 1970s, which was made part of the record, the City did, at one time, experiment with pressure testing of older water mains that were abandoned and no longer in service. Raymond J. Kocol, *Pressure Testing the Distribution System in Milwaukee,* J. Am. Water Works Ass'n, July 1972, at 430. This journal article discusses an experimental pressure testing procedure and recommends that the City adopt a regular pressure testing program in conjunction with a comprehensive water main replacement program. *Id.* at 433. The article also explains that the tests were performed on pipes that were no longer in service and

that some of the testing was performed after the pipes had been removed from the ground. *Id.* at 430–31. However, there is no evidence in the record that would indicate that the City ever adopted such a program or that the testing described in the article was anything more than a one-time experiment. Indeed, the article notes that pressure testing "is still in the developmental stage," and refers to the City's "limited experience" with pressure testing. *Id.* at 430. The article further describes the project as a "basic research project." *Id.*[28]

¶ 84. MMSD's third argument in relation to notice is that there were two previous breaks that occurred in the water main in question in 1988 and 1989. MMSD asserts that these breaks put the City on constructive notice that there may have been a leak in the system, such that further inspection was required. A Water Distribution Manager for Milwaukee Waterworks, Laura Daniels, stated in an affidavit that from the time the water main was installed at 40th and Bluemound until the water main break in question, there were two previous breaks in the surrounding four-block area. The first break occurred in 1988 and was located on 40th street, approximately 630 feet south of Bluemound Road. The second break occurred in 1989 and was located on 40th street, approximately

---

[28] MMSD also cites to the deposition of Dinah Gant as proof that the City once employed pressure testing but stopped in 1996. However, Ms. Gant never testified that the City once employed a system of pressure testing. Rather, counsel for MMSD queried: "it sounded to me like you said you used to do pressure testing." Ms. Gant responded by stating that there had not been any pressure testing since she joined Milwaukee Waterworks in 1996. Nowhere in the portion of Ms. Gant's deposition that is in the record does she state that the City employed a system of pressure testing and then abandoned it.

691

1000 feet south of Bluemound Road. Both breaks were described as "minor in nature, and were repaired in the normal course of business." Ms. Daniels further stated that there was no record of any previous complaints or repairs within 579 feet of the break at issue in this case. The record contains no further testimony concerning these leaks.

¶ 85. Again, MMSD's argument fails because there is simply no testimony concerning the standard of care for a waterworks operator. Constructive notice may be established by the existence "of previous breaks in the main at or near the break complained of . . . *providing that the number of previous breaks is more than that which would be expected.*" 78 Am. Jur. 2D *Waterworks and Water Companies* § 61 (emphasis added). Whether two minor breaks in a water main, each over 600 feet from the eventual leak, would place a reasonable waterworks operator on notice that there was a leak somewhere else in the system is certainly beyond normal lay comprehension. Restatement (Second) of Torts § 839 cmt. i ("The possessor has a duty to inspect his premises and learn about harmful conditions on his land only when the circumstances are such that a reasonable person in his position would realize that there might be harmful conditions upon it.").

¶ 86. Also, the extent to which a reasonable waterworks operator would conduct inspections in such circumstances is a matter requiring special knowledge. For instance, after notice of a previous leak, assuming it was of the type that would lead a reasonable waterworks operator to conduct an inspection, would a reasonable inspection include digging up 50 feet of pipe, 100 feet of pipe, or 500 feet of pipe? In other words, even assuming MMSD could prove either the 1988 or 1989 break, or both, were sufficient to put the City on notice

of a leak somewhere else in the system, there is still no evidence as to what would constitute a reasonable inspection.

¶ 87. MMSD's final argument regarding constructive notice is that the City was aware that the 1992–93 construction project could have damaged its water main and therefore the City was under a duty to inspect its pipe. Mr. Chisholm testified that the water main in question was susceptible to damage from this construction project and Mr. Heuer testified that the construction project could be an explanation for the leaky pipe. Apparently, City records indicate that the water mains in the area were supposed to have been inspected and tested following the construction project. However, when asked about these records, Mr. Scheller testified that inspection and testing were never done. Assuming MMSD can prove that the 1992–93 construction project damaged the water main and that a reasonable inspection after the construction project was completed would have revealed the defect in the pipe,[29] we believe there exists a disputed issue of material fact with regard to notice.[30]

---

[29] Given Mr. Chisholm's testimony that the fracture in the water main existed from .8 to 2.6 years, there is a dispute over whether any defect would be observable immediately after the 1993 construction project was completed.

[30] The City also argues that we should deny liability based on public policy factors. In *Physicians Plus,* 254 Wis. 2d 77, ¶¶ 44, 49, we noted that liability could be denied in an appropriate nuisance case based on the traditional six public policy factors. The City's one-page public policy argument does not identify which public policy factors support denying liability. An appellate court need not consider arguments that are

## V. SUMMARY

¶ 88. We hold that in order to establish a prima facie case for liability for a nuisance, there must be proof of the nuisance, proof of the underlying tortious conduct giving rise to the nuisance, and proof that the tortious conduct was the legal cause of the nuisance. The alleged nuisance in this case is the City's interference with MMSD's property interest in its sewer.

¶ 89. We conclude that under the law governing liability for nuisance based on intentional conduct, the pleadings and record do not support any claim that the City intentionally created a nuisance. We conclude that the only actionable tortious act giving rise to the nuisance in this case is the City's alleged negligence in failing to repair its leaky water main before it burst. We reaffirm our existing case law that when a nuisance is predicated on negligence, all the usual rules and defenses applicable to negligence claims apply. Thus, when a nuisance is predicated on a negligent failure to act, there must be proof that the defendant's conduct constituted actionable negligence, including proof of notice, regardless of whether the alleged nuisance is public or private.

¶ 90. Moreover, we hold that under § 893.80(4), and Wisconsin's immunity jurisprudence since *Holytz,* a municipality may be immune from nuisance suits depending on the nature of the tortious acts giving rise to the nuisance. A municipality is immune from suit for nuisance if the nuisance is predicated on negligent acts that are discretionary in nature. A municipality does not enjoy immunity from suit for nuisance when the

inadequately briefed. *State v. Pettit,* 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992). Thus, we do not address this argument.

underlying tortious conduct is negligence and the negligence is comprised of acts performed pursuant to a ministerial duty.

¶ 91. Decisions concerning the adoption, design, and implementation of a public works system are discretionary, legislative decisions for which a municipality enjoys immunity. Thus, the City is immune from suit relating to its decisions regarding the adoption of a waterworks system, the selection of the specific type of pipe, the placement of the pipe in the ground, and the continued existence of such pipe. In contrast, the City may be liable for its negligence in failing to repair the leaky water main. However, since there exists a material issue of fact as to whether the City had notice of the leaking water main, we cannot determine whether the City was under a ministerial duty to repair its water main prior to the break. Thus, we cannot determine whether the City is immune under § 893.80(4) from liability predicated upon a negligent failure to repair the water main before it burst.

¶ 92. Finally, viewing the summary judgment materials in a light most favorable to MMSD, we conclude that there are at least two disputed issues of material fact. In addition to the disputed issue of fact regarding whether the City had notice of the leaking water main prior to the break, there exists a disputed issue of fact as to what caused MMSD's sewer to collapse. Therefore, we affirm the decision of the court of appeals, reversing the circuit court's grant of summary judgment in favor of the City.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 93. DAVID T. PROSSER, J. *(concurring).* I agree with the court's decision to remand this case to

the circuit court, as directed by the court of appeals. *Milwaukee Metropolitan Sewerage Dist. v. City of Milwaukee,* 2003 WI App 209, ¶ 33, 267 Wis. 2d 688, 671 N.W.2d 346. I also agree with the court's comprehensive discussion of nuisance law. My problems with the majority opinion are twofold.

¶ 94. First, the court's discussion of governmental immunity reiterates several principles of law that, in my judgment, depart from the language and legislative intent of Wis. Stat. § 893.80(4). My views on this subject are stated in *Scott v. Savers Property and Casualty Insurance Co.,* 2003 WI 60, ¶¶ 75–82, 262 Wis. 2d 127, 663 N.W.2d 715 (Prosser, J., dissenting), and *Willow Creek Ranch L.L.C. v. Town of Shelby,* 2000 WI 56, ¶¶ 59–172, 235 Wis. 2d 409, 611 N.W.2d 693 (Prosser, J., dissenting). The court's present opinion not only firms up mistaken principles but also criticizes *Costas v. City of Fond du Lac,* 24 Wis. 2d 409, 129 N.W.2d 217 (1964), a case both filed and decided *after Holytz v. City of Milwaukee,* 17 Wis. 2d 26, 115 N.W.2d 618 (1962), and *after* enactment of the predecessor to Wis. Stat. § 893.80(4). *See* ch. 198, Laws of 1963 (effective July 27, 1963). When the *Holytz* court abrogated the principle of governmental immunity in 1962, and saw its decision promptly codified by the Wisconsin legislature, it could not have imagined that a successor court would assert that it was actually expanding immunity to cover government activities previously determined *not* to be immune.

¶ 95. Second, I have trouble reconciling the discussion in the section on summary judgment with the discussion in the section on governmental immunity. The court acknowledges that "a municipality *may* be liable for a nuisance founded upon negligent acts." Majority op., ¶ 59. But then it states: "The only act for

696

which the City may be potentially liable is its failure to repair the leaking water main." *Id.*, ¶ 61. "The question [is] whether the City was under a ministerial duty to repair the leaking main *before* it broke," a duty "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id.* (quoting *Lister v. Bd. of Regents,* 72 Wis. 2d 282, 301, 240 N.W.2d 610 (1976)). As a practical matter, this formulation is so narrow that it appears to decide the case.

¶ 96. Because of these concerns, I respectfully concur.